UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

JOHN DOE,
          Plaintiff,

v.                                          C.A. NO.: 18-106-JJM-LDA

JOHNSON & WALES UNIVERSITY,
          Defendant.


# DEFENDANT JOHNSON & WALES UNIVERSITY'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT


JOHNSON & WALES UNIVERSITY
BY ITS ATTORNEYS,

STEVEN M. RICHARD (#4403)
JEFFREY S. BRENNER (#4359)
NIXON PEABODY LLP
ONE CITIZENS PLAZA, SUITE 500
PROVIDENCE, RI  02903
TEL: 401-454-1020
FAX: 401-454-1030
EMAIL: srichard@nixonpeabody.com
          jbrenner@nixonpeabody.com

June 14, 2019

# TABLE OF CONTENTS

Page

SUMMARY OF THE ARGUMENT ................................................................................ 1

STANDARD OF REVIEW ........................................................................................... 3

    A.    The Rule 56 Standard ..................................................................................... 3

    B.    The Court's Limited Role In Reviewing Disciplinary Decisions ................. 3

ARGUMENT ............................................................................................................... 5

    A.    Plaintiff's Title IX Erroneous Outcome Claim Fails As A Matter Of Law ... 5

        1.  JWU'Policies Are Gender Neutral ........................................................... 7

        2.  That Most Respondents Are Allegedly Male Does Not Indicate
            Systemic Bias ........................................................................................ 7

        3.  The Investigation Did Not Start With Preconceived Assumptions .......... 8

        4.  JWU Properly Applied The Preponderance Of The Evidence
            Standard ............................................................................................... 10

        5.  The Panelists Were Fair And Impartial .................................................. 11

        6.  Plaintiff's Unproven Contentions Of "Unfairness" Cannot Support
            A Title IX Erroneous Outcome Claim ..................................................... 14

    B.    JWU Did Not Breach Its Contract With John Doe ....................................... 16

        1.  The First Alleged Breach ....................................................................... 19

        2.  The Second Alleged Breach ................................................................... 21

            (i)  The Investigation ........................................................................ 21

            (ii)  The Panelists' Training ............................................................... 22

            (iii)  The Decision Letter .................................................................... 24

        3.  The Third Alleged Breach ...................................................................... 24

        4.  The Fourth Alleged Breach .................................................................... 25

Page

C.     JWU Did Not Breach The Implied Covenant Of Good Faith And Fair Dealing............................................................................................ 26

D.     Plaintiff's Claim For Negligent Infliction Of Emotional Distress Fails As A Matter of Law .......................................................................................... 27

E.     Plaintiff's Claim For Declaratory Judgment Fails As A Matter Of Law ....... 29

CONCLUSION ................................................................................................................ 29

4841-3252-7770.3

## SUMMARY OF THE ARGUMENT

Defendant Johnson & Wales University ("JWU") adhered to its Title IX obligations and its educational contract with Plaintiff, who is proceeding under the pseudonym "John Doe." JWU has no liability to Plaintiff as shown by JWU's Rule 56(a) Statement of Undisputed Facts and supporting Declarations and for the legal reasons stated herein. Summary judgment should enter in JWU's favor on the remaining claims in Plaintiff's Complaint.[1]

To avoid summary judgment, Plaintiff cannot merely rest on his Complaint's allegations, nor can he rely upon his unsubstantiated assertions or subjective characterizations. In Doe v. Trustees of Boston College, 892 F.3d 67 (1st Cir. 2018), which adjudicated a challenge to a sexual misconduct disciplinary process, the First Circuit held that "a complete lack of evidence – whether direct or circumstantial – will not allow a party to survive summary judgment. Conclusory allegations are not enough." Id. at 92. "More than 'conclusory allegations, improbable inferences, and unsupported speculation' is required to defeat summary judgment." Id. at 92-93 (citation omitted); Bleiler v. Coll. of the Holy Cross, C.A. No. 11-11541-DJC, 2013 WL 4714340, at *13 (D. Mass. Aug. 28, 2013) (entering summary judgment in college's favor on Title IX and contract claims, the court ruled that "alleged prejudice of university hearing bodies must be based upon more than mere speculation and theoretical inferences").

Plaintiff's Title IX "erroneous outcome" claim fails as a matter of law because he has not

---

[1] At the Rule 12(b)(6) stage, the Court dismissed Plaintiff's claims for Estoppel and Reliance (Count III), Intentional Infliction for Emotional Distress (Count V), and Injunctive Relief as a separate cause of action (Count VII). 5/14/18 Text Order. JWU's summary judgment motion addresses the following remaining claims in Plaintiff's Complaint: Breach of Contract (Count I); Breach of Implied Covenant of Good Faith and Fair Dealing (Count II); Title IX (Count IV); Negligent Infliction of Emotional Distress (Count VI), and the request for a Declaratory Judgment (Count VII). In this memorandum, JWU addresses first the Title IX claim followed by the state law claims and the request for declaratory relief.

offered any evidence "cast[ing] some articulable doubt on the accuracy of the disciplinary proceeding" and indicating the "gender bias was a motivating factor." <u>Trs. of Boston Coll.</u>, 802 F.3d at 91 (quoting <u>Yusuf v. Vassar Coll.</u>, 35 F.3d 712, 715 (2d Cir. 1994)). The undisputed facts show that JWU conducted its investigation and adjudicated the charges in an appropriate and gender-neutral manner. There is no shred of evidence that any JWU administrator or campus security officer, connected with the charges against Plaintiff or with the sanction ultimately imposed upon him, exhibited any gender-based bias or that any such bias played any part in the disciplinary process.[2]

Regarding Plaintiff's contract claims, the Court must look to Plaintiff's reasonable expectations of JWU's policies as written, not his unreasonable belief that they should have stated something else (e.g., requiring a higher standard of proof than a preponderance of the evidence, etc.). Because JWU complied with its (perfectly fair) policies consistent with the student's reasonable expectations, there was no breach of contract or the implied covenant of good faith and fair dealing. Moreover, Plaintiff's claim for the breach of the implied covenant of good faith and fair dealing is additionally infirm because JWU's investigation and adjudication of the charges against Plaintiff were free from any arbitrary or capricious conduct.

Plaintiff's negligent infliction emotional distress claim also fails as a matter of law. Plaintiff has not alleged any physical symptomology, which compelled the Court to dismiss his claim for intentional infliction of emotional distress at the Rule 12(b)(6) stage and, for the same reason, requires the entry of summary judgment in JWU's favor regarding the negligent infliction of emotional distress claim. Also, as the First Circuit held in <u>Trustees of Boston College</u>, a

---

[2] Plaintiff's Title IX count does not plead explicitly the theory of liability. During the Rule 12(b)(6) hearing, the Court and the parties confirmed that Plaintiff is proceeding on an "erroneous outcome" theory. ECF No. 36 (6/25/18 Tr. of Rule 12(b)(6) hearing) at 6:13-16.

negligence claim is improper when it is based entirely upon alleged duties that derive from a university's contractual relationship with a student, which is the case here.  892 F.3d at 93-95.

Finally, there is no legal or factual support for the Court to enter a declaratory judgment in Plaintiff's favor.  JWU did not breach any statutory or contractual obligation to Plaintiff, so he is not entitled to any relief – monetary, equitable, or declaratory.

## STANDARD OF REVIEW

### A.    The Rule 56 Standard

The Court grants summary judgment when no genuine issue of material fact exists, and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Facts are material if they carry the potential to affect the outcome of the suit under applicable law.  Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (citation omitted).  The movant must show the absence of a genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000).  If the movant meets that burden, the non-moving party must "with respect to each issue on which [he] would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in [his] favor," Borges ex. rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010), instead of merely resting upon allegations or denials in the pleadings.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). The Court views the record in the light most favorable to the non-moving party, drawing all reasonable inferences in his favor.  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

### B.    The Court's Limited Role In Reviewing Disciplinary Decisions

The United States Supreme Court has stated that "courts should refrain from second guessing the disciplinary decisions made by school administrators."  Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 648 (1999).  And Title IX should be construed to give "[s]chool administrators . . . [the] flexibility they require" to initiate a reasonable disciplinary

3

inquiry.  Id.; see also Haidak v. Univ. of Mass. at Amherst, 299 F. Supp. 3d 242, 269 (D. Mass.

2018) (granting summary judgment in the university's favor because its disciplinary panel's

"conclusion was supported by substantial evidence and involved a credibility determination it was

in the best position to make"), appeal argued on Jan. 8, 2019, No. 18-1248 (1st Cir.).

It is important to place this litigation in its proper context.  This is not a civil lawsuit

between Plaintiff and the female student referenced in his Complaint under the pseudonym "Mary

Smith," nor a criminal proceeding against Plaintiff.  Plaintiff's claims do not require the Court to

make an independent determination: (1) regarding what happened between him and Mary Smith

during two evenings at issue in the fall of 2016; (2) whether a sexual assault occurred during either

or both of those evenings; (3) whether Mary Smith consented to all of Plaintiff's actions; or (4)

who, as between Plaintiff and Mary Smith, gave the more credible account to JWU.  See Doe v.

Univ. of the S., 687 F. Supp. 2d 744, 755 (E.D. Tenn. 2009).

In John Doe v. Brown University, the Court stressed its limited role:

> It is not the Court's role to determine the facts of what happened between
> [the respondent] and [the complainant]; to decide whether the Court would
> have, in the panel's position, found [the respondent] responsible for sexual
> misconduct; to evaluate whether the Court would have made the same
> judgment calls on evidence and other issues as [the university] did; or to
> determine whether the procedure [the respondent] received was optimal.
> This Court is not a super-appeals court for sexual misconduct cases, nor is
> it an advisor to [a university] on how it should handle these messy and
> unfortunate cases.

210 F. Supp. 3d 310, 312-13 (D.R.I. 2016).  "To be perfectly clear, a student is not entitled to a

perfect disciplinary process, and it is not the Court's role to be an appeals court for a [university's]

disciplinary decisions.  Nor is it the case that any minor technical violation entitles the student to

a new disciplinary hearing or a review by this Court."  Id. at 331; Pierre v. Univ. of Dayton, 2017

WL 1134510, at *8 (S.D. Ohio Mar. 27, 2017) (quoting Wood v. Strickland, 420 U.S. 308, 326

(1975) ("It is not the role of federal courts to set aside decisions of school administrators which

4

the court may view as lacking in compassion.")); <u>Yu v. Vassar Coll.</u>, 97 F. Supp. 3d 448, 461 (S.D.N.Y. 2016) ("The Court's role, of course, is neither to advocate for best practices or policies nor to retry disciplinary proceedings.") (citing <u>Doe v. Univ. of the S.</u>, 687 F. Supp. 2d at 755).

**ARGUMENT**

**A.**     **Plaintiff's Title IX Erroneous Outcome Claim Fails As A Matter of Law.**

Title IX of the Education Amendments of 1972 prohibits discrimination on the basis of gender in education programs and activities receiving federal funds, providing, with certain exceptions not relevant here, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a). There is no dispute that Title IX applies to JWU.

Nationally, courts have addressed Title IX lawsuits by plaintiffs who were expelled, suspended, or otherwise disciplined in university and college sexual misconduct adjudications. While some of the lawsuits, including this one, have survived Rule 12(b)(6) dismissals of  Title IX claims, courts have appropriately examined a plaintiff's Title IX claim at the summary judgment stage subject to a much stricter and more demanding scrutiny, requiring the plaintiff to present specific, admissible, and competent evidence to support alleged gender bias.

Contrary to what Plaintiff apparently believes, he is not entitled to a free pass to proceed to trial simply based upon his subjective assumptions and unsubstantiated assertions.  Federal appellate circuit courts, including the First Circuit in <u>Trustees of Boston College</u>, have affirmed the entry of summary judgment in a college or university's favor, where a plaintiff challenging a disciplinary process failed to meet the required high burden of evidentiary proof.  <u>See</u>, <u>e.g.</u>,  <u>Trs. of Boston Coll.</u>, 892 F.3d at 89-93; <u>Doe v. Colgate Univ.</u>, No. 17-3594-cv, 2019 WL 190515, at *5-8 (2d Cir. Jan. 15, 2019); <u>Malloy v. Ohio Univ.</u>, 76 Fed. Appx. 634, 639-41 (6th Cir. 2003).  At

5

the trial court level, federal district courts are routinely entering summary judgment in favor of colleges and universities on Title IX claims challenging disciplinary processes. See, e.g., Doe v. Case Western Univ., Case No. 1:17 CV 414, 2019 WL 1982266, at *8-12 (N.D. Ohio May 2, 2019); Doe v. St. Joseph's Univ., Civ. No. 18-2044, Order (Doc. 88) at 11-26 (E.D. Pa. Apr. 24, 2019). Montague v. Yale Univ., Civil No. 3:16-CV-00885 (AVC), slip opin. (Doc. No. 177) at 49-59 (D. Conn. Mar. 29, 2019); Haidak, 299 F. Supp. 3d at 269; Rossley v. Drake Univ., 342 F. Supp. 3d 904, 924-935 (S.D. Iowa 2018); Yu., 97 F. Supp. 3d at 461-81; Bleiler, 2013 WL 4714340 at * 3-14.

In Trustees of Boston College, the First Circuit applied and analyzed the Title IX erroneous outcome framework, 892 F.3d at 90, which this Court has described as follows:

> [Under the erroneous outcome framework], "the claim is that the plaintiff was innocent and wrongly found to have committed the offense." Yusuf, 35 F.3d at 715. A plaintiff making an erroneous outcome claim must first "allege particular facts to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." Id. Once the plaintiff has cast some articulable doubt concerning the accuracy of the proceeding, [he or she] must next "allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." Id. (citations omitted). The Yusuf court noted that "[s]uch allegations might include, inter alia, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." Id.

Doe v. Brown Univ., 166 F. Supp. 3d 177, 185 (D.R.I. 2016).

As JWU argues below in addressing Plaintiff's breach of contract claim, there is no evidence suggesting any error that casts any doubt upon the outcome of Plaintiff's disciplinary case, so Plaintiff's Title IX claim fails at the first prong of the erroneous outcome framework. Even assuming, *arguendo*, that the analysis reaches the second prong, the record is devoid of any proof demonstrating "that there was a causal connection between the outcome of Doe's disciplinary proceedings and gender bias." Trs. of Boston Coll., 892 F.3d at 91. Relying upon

unsubstantiated contentions pled "upon information and belief" and purely subjective beliefs, Plaintiff's Complaint attempts to connect his disciplinary process to his gender in various ways. Upon an examination of the actual record evidence, none of Plaintiff's various contentions pled or implied in his Complaint come anywhere close to raising any genuine issue of material fact suggesting any gender bias against him.

### 1.   JWU's Polices Are Gender Neutral.

JWU's Code of Student Conduct and Conduct Review Process and JWU's related policies regarding sexual assault and harassment are gender neutral on their face.  See JWU's Local Rule 56(a) Statement of Undisputed Facts ("SUF") at ¶¶ 6-26.  In Trustees of Boston College, the First Circuit held that such gender-neutral policy language cannot reasonably support any inference of systemic bias in its application.  892 F.3d at 92.  See also Doe v. Colgate Univ., Case No. 5:15-cv-1069, 2017 WL 4990629, at *15 (N.D.N.Y. Oct. 31, 2017) (citing Yu, 97 F. Supp. 3d at 478) (rejecting an argument that university hearing policies reflected gender bias where its terms were "entirely gender neutral"), aff'd., 760 Fed. Appx. 22, 2019 WL 190515, at *5-8 (2d Cir. Jan. 15, 2019).  The same analysis applies here.  Nothing in JWU's policies or procedures assumes that the complainant will be female and the respondent will be male.  Nor has Plaintiff identified any such biased language in any of JWU's policies or procedures.

### 2.   That Most Respondents Are Allegedly Male Does Not Indicate Systemic Bias.

In paragraph 39 of his Complaint, Plaintiff alleges "[u]pon information and belief, nearly all JWU students punished through the [Conduct Review Process] for sexual assault and/or sexual harassment have been males."  Even if true, this is immaterial.  In Trustees of Boston College, the First Circuit rejected an argument that a gender neutral policy can be deemed to promote systemic gender bias simply based on the gender makeup of the respondents.  892 F.3d at 92.  "The gender

of the students accused of sexual assault is the result of what is reported to the University, not the other way around." Id.; see Austin v. Univ. of Or., 205 F. Supp. 3d 1214, 1226-27 (D. Or. 2016) (dismissing Title IX claim because "a pattern of enforcement against males alone does not give rise to an inference of sex discrimination"), aff'd, No. 17-35559, 2019 WL 2347380 (9th Cir. June 4, 2019); King v. DePauw Univ., 2014 WL 4197507, at *10 (S.D. Ind. Aug. 22, 2014) ("DePauw is not responsible for the gender makeup of those who are accused by other students of sexual misconduct, and the fact that a vast majority of those accused were found liable might suggest a bias against accused students, but says nothing about gender.").

Just as was true in Trustees of Boston College and the other authorities cited, the gender makeup of the parties to sexual misconduct cases at JWU signals no gender bias. Rather, JWU investigates and adjudicates complaints as they are reported to the university under the Conduct Review Process. SUF at ¶ 17. Moreover, JWU has had Title IX cases where the respondents were female and, in cases with male respondents, has adjudicated multiple male students not responsible. SUF at ¶ 142. Plaintiff's conclusory allegation of systemic gender bias based solely on the alleged gender makeup of Title IX respondents at JWU is not supported by the actual facts and has been deemed legally insufficient to suggest any gender bias.

### 3.     The Investigation Did Not Start With Preconceived Assumptions.

Plaintiff alleges that JWU's investigation evidences gender bias based upon an isolated email Sergeant Jeffery Robinson sent Mary Smith on June 2, 2017, after her boyfriend, "B.K.," reported that she had been sexually assaulted a day earlier to JWU's Campus Safety & Security ("CS&S"). Compl. at ¶¶ 50-51. Plaintiff makes much of Sergeant Robinson's request that Mary Smith "validate" the sexual assault allegations of her boyfriend and noted that "it has been brought to my attention that you were the victim of a sexual assault this past academic year (2016-2017). I want you to know that we are here to support you." Id. at ¶ 50. While Sergeant Robinson did

8

not use the lawyerly formulation Plaintiff may prefer – such as stating that Mary Smith was an **alleged** victim or framing the matter in the passive voice, id. at ¶ 51, his phrasing in no way suggested that he assumed her to be telling the truth or presumed her to be a victim, as Plaintiff purely speculates.

To rebut Plaintiff's baseless allegation, JWU has provided the full and proper factual context of Sergeant Robinson's outreach to Mary Smith in June 2017, supported by a declaration executed by Sergeant Robinson to confirm the actual record facts.  See Declaration of Jeffery Robinson ("Robinson Decl.") and SUF at ¶¶ 40-51.

As Sergeant Robinson attests, he has been trained as a CS&S officer that when complainants of sexual assault come forward, he should not assume the they are or are not telling the truth.  Robinson Decl. at ¶¶ 4-5; SUF at ¶ 47.  He has also been trained to deal with complainants and respondents, male or female, in an objective and fair manner.  Id.  To ensure a proper investigation, Sergeant Robinson offers complainants an avenue to come forward and report their allegations and resources to assist them in making a report.  Robinson Decl. at ¶ 5; SUF at ¶ 48.  Nothing about this procedure remotely implies gender bias.

Consistent with both the Conduct Review Process and his duties as a CS&S officer, Sergeant Robinson sought to have Mary Smith, an alleged victim of a sexual assault, confirm information pertaining to her as reported by a third-party.  Robinson Decl. at ¶ 8; SUF at ¶ 50. When Sergeant Robinson requested that Mary Smith "validate" the allegations reported by a third party, he was merely requesting that she provide her own first-hand account and information for purposes of JWU's ability to investigate moving forward.  Robinson Decl. at ¶¶ 5-6; SUF at ¶ 48. Nor is it Sergeant Robinson's role to make credibility determinations, as the hearing panelists ultimately make such determinations if the matter proceeds to a hearing through the Conduct

Review Process.  Robinson Decl. at ¶ 8; SUF at ¶ 50.

Likewise, Sergeant Robinson's statement to Mary Smith that "I want you to know that we are here to support you" does not suggest bias.  To the contrary, JWU provides support and resources to both complainants and respondents.  Id. at ¶ 7; SUF at ¶ 49.  In accordance with this protocol, on June 5, 2017, when Sergeant Robinson informed Plaintiff about the allegations against him, Sergeant Robinson provided Plaintiff with JWU's Sexual Assault and Relationship Violence Policy and information about supportive measures for an accused student.  SUF at ¶ 44.

Contrary to Plaintiff's subjective beliefs, unsubstantiated conjecture and incorrect assumptions, CS&S did not make any predetermined conclusions in June 2017.  After Mary Smith made clear to Sergeant Robinson that she did not wish to proceed at that time with the allegations reported by B.K., JWU closed its investigation in June 2017.  SUF at ¶ 51.  It was not until Mary Smith herself came forward in September 2017 to file a complaint against Plaintiff that CS&S reopened the investigation.  Id. at ¶¶ 52-65.

### 4.    JWU Properly Applied The Preponderance Of The Evidence Standard.

Plaintiff protests that JWU applied the "absurdly low" and "unquestionably unfair" preponderance of the evidence standard, which was the applicable standard under the Conduct Review Process.  Compl. at ¶¶ 34, 44.  JWU applied this standard consistent with Title IX guidance issued by the Department of Education's Office for Civil Rights ("OCR").   In its April 4, 2011, Dear Colleague Letter ("DCL"), OCR mandated that colleges and universities use the preponderance of the evidence to adjudicate sexual misconduct disciplinary cases.  See 4/4/11 DCL Ltr. at 10-11, available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.  On September 22, 2017, during the course of Plaintiff's disciplinary case, OCR revoked its April 4, 2011 DCL, and issued a *Q&A on Campus Sexual Misconduct* to provide Title IX guidance, pending the Department of Education's issuance of Title IX regulations after public

10

comment.  The *Q&A* states the "findings of fact and conclusions [in a sexual misconduct disciplinary case] should be reached **by applying either a preponderance of the evidence standard or a clear and convincing evidence standard**."  *Q&A* at p.5, ans. to quest. 8 (emphasis added),   available   at   https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf added).  JWU's preponderance of the evidence standard remained consistent with OCR's guidance, as revised on September 22, 2017.

After the completion of Plaintiff's disciplinary case, on November 16, 2018, the Department of Education issued its Notice of Proposed Rulemaking concerning its Title IX regulations.   See  https://www2.ed.gov/about/offices/list/ocr/docs/title-ix-nprm.pdf.   Extensive public comments were submitted in response to the proposed Title IX regulations, which remain under review with the Department.  Where the finalized Title IX regulations may ultimately stand on the applicability of the preponderance of evidence standard remains to be seen.  Consistent with OCR's current Title IX guidance, there is no dispute that JWU was authorized to apply a preponderance standard to Plaintiff's disciplinary case.

Finally, as this Court knows, the preponderance of the evidence standard is applied in civil proceedings throughout the country, including this Court and the Rhode Island Superior Court.  As a relevant example, this Court applied the preponderance of the evidence standard to adjudicate a suspended student's breach of contract claim against his university.  Doe v. Brown Univ., 210 F. Supp. at 331 (in a "very close case," the plaintiff had proven "by a preponderance of the evidence" that a breach of contract occurred entitling the student to a new disciplinary hearing).  There is nothing "absurdly low" or "unquestionably unfair" about the preponderance-of-the-evidence standard of proof.

## 5.    The Panelists Were Fair And Impartial.

In Trustees of Boston College, the First Circuit acknowledged the presumption of

impartiality afforded to university disciplinary boards:

> [I]t has been noted that 'alleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences.'" Gorman v. Univ. of R.I., 837 F.2d 7, 15 (1st Cir. 1988) (quoting Duke v. N. Tex. State Univ., 469 F.2d 829, 834 (5th Cir. 1972)).  In reviewing schools' disciplinary procedures, "a presumption [of impartiality] favors the administrators, and the burden is upon the party challenging the action to produce evidence sufficient to rebut this presumption.  Id.  See also Nash v. Auburn Univ., 812 F.2d 655, 665 (11th Cir. 1987) ("Any alleged prejudice on the part of the board must be evident from the record and cannot be based in speculation and inference."); Ikpeazu v. Univ. of Neb., 775 F.2d 250, 254 (8th Cir. 1985) ("[W]e observe that the committee members are entitled to a presumption of honesty and integrity unless actual bias, such as personal animosity, illegal prejudice, or a personal stake in the outcome can be proven.).

892 F.3d at 84.

In his Complaint, Plaintiff wrongly alleges, "upon information and belief," that JWU annually trains its hearing panelists in a manner that "is inherently biased and teaches a belief that a female complainant almost always tells the truth."  Compl. at ¶ 53.  Plaintiff contends that "[i]t is a training regime which is inherently unbalanced against the accused such as John Doe."  Id. While it is one thing for a plaintiff plead sensationalist allegations in a pleading, it is another thing to prove them with actual evidence, which Plaintiff has utterly failed to do here.

JWU has provided declarations by then Assistant Director of Student Conduct Marshall Lancey (who presented JWU's 2017-18 mandatory panelist training) and the three panelists who presided in Plaintiff's disciplinary case confirming that JWU's annual training, including its session at the outset of the 2017-18 academic year, always stresses impartiality throughout the disciplinary process and that no one has ever taught or conveyed during training "a belief that a female complainant always tells the truth." SUF at ¶¶ 27-33, 139.  Again, actual evidence, not baldly stated assertions, must control at the summary judgment stage.

Plaintiff further contends JWU's decision letter dated October 23, 2017, in his disciplinary process "reveals the bias in the decision making" and that its "reasoning for ruling against John Doe shows that he never had a chance."  Compl. at ¶ 54.  He quotes the letter, in part, stating: "'The panelists noted that throughout the hearing, the respondent was not able to articulate specific ways in which he gained consent. Rather, he only noted that the complainant never stated that she was uncomfortable after the alleged incidents occurred. The complainant provided very specific information regarding the words and behaviors she used to convey that she did not give consent or withdrew consent.'"  Id.  Again, the actual evidence dispels yet another of Plaintiff's subjective assumptions.   The panelists' declarations attest to their detailed, open-minded, and careful approach throughout the hearing, where they meet with both parties twice, asked probative questions before they privately and carefully deliberated, and based their decision upon JWU's policy definitions of consent, sexual harassment, and sexual assault.  SUF at ¶¶ 114-125.  They engaged in a quintessential credibility assessment in a case where Plaintiff and Mary Smith took different positions on questions of consent and whether sexual misconduct occurred.   As an essential part of their decision, they had to test and evaluate which of the two parties was more believable.

As one of the panelists stated in his declaration:

> 16.  Both students recalled that they were together during two evenings at issue.  John Doe denied that the bathroom incident occurred during the first evening or that he put his hands around Mary Smith's neck during either evening.   John Doe's descriptions of the two evenings were consistently vague, providing few factual details and not articulating how he obtained Mary Smith's consent for the bedroom intercourse on the second evening that he acknowledged to have occurred.   Mary Smith articulated specific details describing the bathroom and bedroom incidents and clearly testified that John Doe did not have her consent for intercourse in the bathroom or to engage in intercourse after she withdrew her consent in his bedroom.  Mary Smith described that John Doe placed his hands on her neck during both incidents and how uncomfortable his forceful

conduct made her feel.

17.  In my careful assessment of the parties' testimony, I found that Mary Smith was consistently more credible and responsive than John Doe.  I found that the preponderance of the evidence showed that the incident in the bathroom occurred during the first evening and that Mary Smith did not consent to this intercourse initiated by John Doe in a forceful manner. I found that the preponderance of the evidence showed that while consent was initially given at the start of John Doe and Mary Smith's interaction in his bedroom during the second evening, Mary Smith expressly withdrew her consent and that John Doe did not respect her withdrawal of consent and proceeded with sexual intercourse in a forceful manner.

18.  Throughout the hearing and despite the panelists' several inquiries to allow him to provide more responsive and specific answers, John Doe remained evasive and non-responsive to the panelists' questions and was unable to articulate specific facts supporting that he obtained Mary Smith's consent.  More than once, he merely stated that she never told him that she was uncomfortable.  By contrast, Mary Smith provided specific information that she did not consent to either of the two instances of sexual intercourse.

Declaration of Tim Brown ("Brown Decl.") at ¶¶ 16-18; see also Declaration of Caitlin Codding ("Codding Decl.") at ¶¶ 15-17; Declaration of Elizabeth Zmarlicki ("Zmarlicki Decl.") at ¶¶ 15-17; SUF at ¶¶ 114-124.

Consistent with Trustees of Boston College, the Court should apply the strong presumption of a disciplinary panel's impartiality.  The panelists' declarations attest to their careful, thoughtful, and fair work in Plaintiff's disciplinary case. There is no evidence at all to suggest otherwise.

### 6.   Plaintiff's Unproven Contentions Of "Unfairness" Cannot Support A Title IX Erroneous Outcome Claim.

While Plaintiff protests throughout his Complaint that he believes that the disciplinary process was unfair, actual evidentiary proof is required to sustain and prove his contention in a Title IX erroneous outcome claim.  Mere subjective protestations about the disciplinary process and result are simply not enough to come close to clearing the first evidentiary hurdle in the erroneous outcome analysis, requiring a showing of particular facts casting some articulable doubt

14

on the accuracy of the disciplinary proceeding.  <u>Brown Univ.</u>, 166 F. Supp. 3d at 195 (citing <u>Yusuf</u>,

715 F.3d at 715).  Even assuming, *arguendo*, that Plaintiff can somehow reach and attempt to clear

the second hurdle in the analysis, his Title IX claim falls completely flat.  Nothing in this record

shows "particular circumstances suggesting that gender bias was a motivating factor," including

circumstances such as "statements by members of the disciplinary tribunal, statements by pertinent

university officials, or patterns of decision-making that tend to show the influence of gender."

<u>See</u>, <u>e.g.</u>, <u>Salau v. Denton</u>, 139 F. Supp. 3d 988, 998 (W.D. Mo. 2015) (quoting <u>Sahm v. Miami</u>

<u>Univ.</u>, 2015 U.S. Dist. LEXIS 65864 (S.D. Ohio May 20, 2015) ("One case by an individual who

was subjectively dissatisfied with the result of a disciplinary proceeding does not constitute a

pattern of decisionmaking.")).  The time is well past for Plaintiff to stand only on baldly alleged

unfairness – there must be actual and admissible factual evidence sufficiently connecting any

proven error to actual gender bias.

In a case addressing contentions very similar to what Plaintiff alleges here, a male student

asserted an erroneous outcome claim protesting that the college made adverse rulings against him

during his disciplinary hearing and wrongfully "found [his female] accusers' evidence more

relevant, credible, and compelling." <u>Blank v. Knox Coll.</u>, Case No. 14-cv-1386, 2015 WL 328602,

at *2 (C.D. Ill. Jan. 26, 2015)).  The court ruled that the plaintiff failed to show how the action of

the disciplinary board were motivated by gender "as opposed to being gender-neutral acts of

simple procedural discretion afforded to the board by the governing rules." <u>Id</u>. at *3.  "Even if [a]

[u]niversity treated [a] female student more favorably than the [p]laintiff, during the disciplinary

process, 'the mere fact that [p]laintiff is male and [the alleged victim] is female does not suggest

that the disparate treatment was because of [p]laintiff's sex.'" <u>Doe. v. Univ. of St. Thomas</u>, 240

F. Supp. at 984 (D. Minn. 2017) (citing <u>Salau v. Denton</u>, 129 F. Supp. 3d 989, 999 (W.D. Mo.

15

2015), which quoted <u>Doe v. Columbia Univ.</u>, 101 F. Supp. 3d 356, 371 (S.D.N.Y. 2015)).

As the First Circuit and other courts have made clear, a plaintiff's litany of disagreements with a disciplinary process and contentions of procedural irregularities or unfairness are legally insufficient to support a Title IX erroneous outcome claim.  <u>Id.</u> at 89-93; <u>see also</u> <u>Doe v. Case Western Reserve Univ.</u>, Case No. 1:14CV2044, 2015 WL 5522001, at *3-6 (N.D. Ohio Sept. 16, 2015) (gender bias not shown by male plaintiff's allegations that a dean pressured a student to provide evidence against plaintiff, that plaintiff was not permitted to review evidence in developing a defense, and that plaintiff was denied the right to cross-examine the accuser); <u>Doe v. Univ. of Mass. Amherst</u>, Case No. 14-301343, 2015 WL 4306521, at *8 (D. Mass. July 14, 2015) (male plaintiff's allegations were insufficient to show gender bias although he claimed that there were "difficulties getting information, deficiencies in the investigation, limits placed on his ability to cross-examine witnesses, the exclusion of documentary evidence he wished to introduce, and the misuse of witness testimony by the hearing board").

## B.    JWU Did Not Breach Its Contract With John Doe.

In <u>John Doe v. Brown University</u>, the Court articulated the legal analysis applicable to a claim alleging a breach of an educational contract:

> To prevail in a breach of contract claim, "a plaintiff must prove that (1) an agreement existed between the parties, (2) the defendant breached the agreement, and (3) the breach caused (4) damages to the plaintiff." <u>Barkan v. Dunkin' Donuts, Inc.</u>, 627 F.3d 34, 39 (1st Cir. 2009) (citing <u>Petrarca v. Fid. & Cas. Ins. Co.</u>, 884 A.2d 406, 410 (R.I. 2005)).  "To establish causation, the plaintiff must prove that the defendant's breach was the 'but for' cause of the alleged damages." <u>Id.</u> (citing <u>Wells v. Uvex Winter Optical, Inc.</u>, 635 A.2d 1188, 1191 (R.I. 1994)).  "The relevant terms of the contractual relationship between a student and a university typically include language found in the university's handbook." <u>Havlik</u>, 509 F.3d at 34 (citation omitted).  Rhode Island courts interpret the terms of a student's handbook "in accordance with the parties' reasonable expectations, giving those terms the meaning that the university should reasonably expect the student to take from them." Id. (citing <u>Mangla v. Brown Univ.</u>, 135 F.3d 80, 84 (1st Cir. 1998).  Any "[a]mbiguities in a

16

contract must be construed against the drafter of the document," <u>Haviland v. Simmons</u>, 45 A.3d 1246, 1259-60 (R.I. 2012), which in the case of a student handbook is the university.

However, "[b]ecause contracts for private education have unique qualities, we must construe them in a manner that leaves the school administration broad discretion to meet its educational and doctrinal responsibilities." <u>Gorman v. St. Raphael Acad.</u>, 853 A.2d 28, 34 (R.I. 2004); <u>see also</u> <u>Schaer v. Brandeis Univ.</u>, 432 Mass. 474, 735 N.E. 3d 373, 381 (2000) ("[C]ourts are chary about interfering with academic and disciplinary decisions made by private colleges and universities. . . . 'A college must have broad discretion in determining appropriate sanctions for violations of its policies.'" (quoting <u>Coveney v. President & Trustees of the College of the Holy Cross</u>, 388 Mass. 16, 445 N.E.2d 136, 139 (1983)). Therefore, the rules set out in a university's handbook are "enforceable as long as [they are] not against public policy or law." <u>Gorham</u>, 853 A.2d at 39. A rule "violates public policy only if it is: '[1] injurious to the interests of the public, [2] interferes with the public welfare or safety, [3] is unconscionable; or [4] tends to injustice or oppression.'" Id. (quoting <u>City of Warwick v. Boeng Corp.</u>, 472 A.2d 1214, 1218 (R.I. 1984)). Courts may also "provid[e] a judicial remedy to members of private voluntary organizations aggrieved by the arbitrary and capricious application of otherwise reasonable rules by the officers of those organizations." <u>King v. Grand Chapter of Rhode Island Order of E. Star</u>, 919 A.2d 991, 998 (R.I. 2007).

210 F. Supp. 3d at 330-31.

As the Court held in <u>Brown University</u>, there are three questions in the contract analysis: 1) whether JWU's rules and procedures, on their face, violate public policy or the law; 2) whether JWU violated any of the specific terms of its contract or applied its rules arbitrarily and capriciously in Plaintiff's case; and 3) if there was a breach of contract, whether that breach caused Plaintiff damage. <u>Id</u>. at 331. Because the answer to the first two questions is "no," there is no need to reach the third question.

Regarding the first question in the contract analysis, there is absolutely nothing in the record suggesting that JWU's policies, particularly its Conduct Review Process, are either against public policy or violate the law. Nor does Plaintiff identify a single provision that supposedly violates any public policy or is illegal in any way. Instead, Plaintiff pleads that JWU's policies

17

should be cast aside by the Court, based solely upon his dislike of its procedures and provisions (e.g., reviewing evidence under the preponderance standard) and his personal predictions about how the Department of Education may address Title IX requirements in the future.  See, e.g., Compl. at p. 10 n.8 (alluding to Department of Education's notice of proposed regulations and providing Plaintiff's unsolicited forecast that the finalized regulations "will assuredly" provide for a right to counsel and the requirement of the "clear and convincing" standard of proof).[3]  Given the absence of any public policy or legal violation, it is not for the Court to instruct universities on best practices or how to write its Title IX policies.  Brown University, 210 F. Supp. 3d at 330-31, 336 n.12.  "Because contracts for private education have unique qualities, [the Court] must construe them in a manner that leaves the school administration broad discretion to meet its educational and doctrinal responsibilities."  Id. at 330-31 (citing Gorman, 853 A.2d 28, 24 (R.I. 2004)).  JWU's policies must stand and be applied as they are written.

Regarding the second question in the contract analysis, cutting through the bluster and editorializing in his Complaint, Plaintiff identifies in paragraph 44 four alleged breaches of his educational contract with JWU that he purports to explain in paragraphs 45-65:

- "JWU Employed an Unbalanced Procedure for John Doe's Hearing on Sexual Assault/Harassment Complaints" (Compl. at ¶¶ 45-48)

- "The Burden was Fully Placed on John Doe as the Complainant was Presumed from the Beginning to be Telling the Truth" (id. at ¶¶ 49-54)

- "The Facts Do Not Support a Decision Against John Doe Even Under the "More Likely than Not" Standard" (id. at ¶¶ 55-60)

- "New Evidence came to light which demanded a new Hearing and which JWU ignored" (id. at ¶¶ 61-65)

---

[3] Even if Plaintiff's predictions come to fruition, the change in law would not invalidate procedures that were perfectly lawful at the time.

JWU addresses each of these four contentions to show that JWU applied its Conduct Review Process without a breach and consistent with a student's reasonable expectations.

### 1.    The First Alleged Breach

Plaintiff contends he was not provided with any guidance about the disciplinary process, particularly the disciplinary hearing, without citing a single specific JWU policy or provision he claims the university violated.  Even setting aside Plaintiff's failure to identify any specific policy or provision JWU allegedly violated, the undisputed facts confirm Plaintiff received guidance, including several interactions between him and Betsy Gray, the Director of Student Conduct, between the issuance of the charge letter and the hearing to adjudicate the charges.

On September 29, 2017, Student Conduct notified Plaintiff and Mary Smith of the charges and informed each of them to appear separately for pre-hearing conferences with Ms. Gray.  SUF at ¶ 86.  The letter advised Plaintiff to review the Student Code of Conduct, the Conduct Review Process, and possible sanctions, with links to access each document.  Id.  Shortly after his receipt of the September 29 letter, Plaintiff contacted Ms. Gray by telephone.  Ms. Gray explained to him the purpose of the pre-hearing conference and assured him that she would review all of the investigative materials with him and discuss his rights through the Conduct Review Process.  Id. at ¶ 87.  She informed him of his right to bring an advisor of his choice to the pre-hearing conference, which he did.  Id. Ms. Gray encouraged Plaintiff to reach out to JWU's Counseling Services if he felt such support would be helpful.  Id.

In addition, during her pre-hearing conferences with each party:

- Ms. Gray read the investigative reports fully and allowed both John Doe and Mary Smith to take notes (SUF at ¶¶ 95-96);

- She provided John Doe and Mary Smith copies of JWU's Sexual Assault and Relationship Violence Policy, Prohibited Discrimination and Harassment (including Sexual Harassment Policy) and the "What is Sexual

19

Misconduct" section of the Prohibited Discrimination and Harassment (including Sexual Harassment Policy). She specifically referenced the information related to consent in JWU's Sexual Assault and Relationship Violence Policy (id. at ¶ 97);

- She advised John Doe and Mary Smith that Student Conduct would schedule a panel hearing and informed them of their right to bring an advisor of their choice to the hearing (id. at ¶ 98);

- She informed John Doe and Mary Smith that each may bring any relevant materials and witnesses with personal knowledge of the incidents to the hearing (id. at ¶ 99)

- She informed John Doe and Mary Smith that she remained available to answer any questions about the hearing process (id. at ¶ 100).

Plaintiff's pre-hearing conference occurred on October 3, 2017. SUF at ¶ 92. During Plaintiff's pre-hearing conference, Ms. Gray specifically informed him that due to the nature of the alleged incidents, he would face a University dismissal if he were found responsible for the charges, which clearly informed Plaintiff about the seriousness of the matter. Id. at ¶ 97. Two days later, on October 5, 2017, Ms. Gray wrote to Plaintiff to update him on her efforts to schedule the hearing. Id. at ¶ 98. She reiterated that if he had any questions, he should contact her in the Student Conduct office at the provided telephone number. Id. On October 12, 2017, Ms. Gray informed both Plaintiff and Mary Smith that the panel hearing would occur on October 20, 2017. Id. at ¶ 99. As she previously stated in her September 29, 2017, letter, Ms. Gray's October 12, 2017, written communication encouraged Plaintiff to review the Student Code of Conduct, the Conduct Review Process, and possible sanctions prior to the hearing. Id. Because she had not heard from Plaintiff since the October 3, 2017, pre-hearing conference, Ms. Gray placed a telephone call to him on October 18 to check in prior to the panel hearing in two days. Id. at ¶ 100. Plaintiff did not answer, and Ms. Gray left a message telling him to contact Student Conduct if he had any questions or wanted to discuss any issues before the hearing in two days. Id.

The undisputed facts show that, during the 20-day period, between the September 29, 2017, charge letter and Ms. Gray's phone message to Plaintiff on October 18, 2017, Student Conduct provided Plaintiff with information about the charges, the evidence, and the process, including several reminders that he should contact Student Conduct to the extent that all of his questions were not answered during the October 3 pre-hearing conference or if he had any additional questions.   During the 17-day period between the October 3 pre-hearing conference and the October 20 hearing, Plaintiff never contacted Student Conduct.   Contrary to what he alleges, Plaintiff was provided with guidance about the Conduct Review Process and ample time and opportunities to seek any clarifications or additional information.

### 2.   The Second Alleged Breach

Plaintiff alleges a contractual breach contending that "[t]he burden was fully placed on John Doe as the Complainant was Presumed from the Beginning to be telling the truth."   Compl. at ¶¶ 49-54.   Once again, Plaintiff relies on nothing more than his subjective beliefs and protestations about the disciplinary process, not actual admissible evidence.   Plaintiff focuses his beliefs and protestations on three aspects of the Conduct Review Process: (i) the investigation (id. at ¶¶ 49-51); (ii) the panelists' training (id. at ¶¶ 52-53); and (iii) the contents in the October 23, 2017, decision letter conveying the results of the hearing (id. at ¶ 54).   The undisputed facts show no breach of contract occurred.

### (i)   The Investigation

Under the Conduct Review Process, once an alleged Code of Student Conduct violation is reported, an incident report will be prepared by CS&S (or a faculty member where appropriate) describing the nature and circumstances of the incident and the parties involved, which is what occurred on June 1, 2017, when B.K. reported allegations that Mary Smith had been sexually assaulted by Plaintiff.   SUF at ¶¶ 14, 34-38. The Conduct Review Process states that CS&S may

conduct further investigation if additional or supplemental information is needed, which is what occurred starting with Sergeant Robinson's efforts to reach Mary Smith on June 2, 2017.  Id. at ¶¶ 15, 40-41.

Plaintiff rests his breach claim primarily upon the email Sergeant Robinson sent to Mary Smith in early June requesting that she "validate" the allegations reported by B.K. a day earlier that she was a victim of sexual assault.  As addressed above, Sergeant Robinson did exactly what the Conduct Review Process allows, seeking to obtain additional and supplemental information, particularly from the individual who was the alleged victim.  Robinson Decl. at ¶¶ 1-8; SUF at ¶¶ 40-51.  Plaintiff baldly characterizes Sergeant Robinson's legitimate investigative inquiry as "Objectivity be damned, apparently."  Compl. at ¶ 55.  Evidence, not bluster, is what matters at this summary judgment stage, and the undisputed facts show that Sergeant Robinson did nothing wrong.

### (ii)     The Panelists' Training

The Conduct Review Process states that, in disciplinary cases involving sexual assault and relationship violence, the parties have the right to "a hearing conducted by unbiased university officials who receive annual training related to sexual harassment, sexual assault, sexual exploitation, dating violence, and stalking, and how to conduct an investigation."  SUF at ¶ 26.  As addressed above, without any factual basis, Plaintiff contends that the panelists received annual training "which is inherently biased and teaches a belief that a female complainant almost always tells the truth.  It is a training regime which is inherently unbalanced against the accused."  Compl. at ¶ 53.  Nothing in the record supports, or even implies, any truth or accuracy to Plaintiff's unsubstantiated claim.  SUF at ¶¶ 27-33.  Both the JWU administrator who presented the 2017-18 training and all three of the panelists have attested that Plaintiff's allegation is flatly wrong.  Id. For example, in the words of one panelist:

22

5.  In August, 2017, I attended a three-hour training program on JWU's student conduct process presented by Marshall Lancey, Assistant Director of Student Conduct, which included training on how to conduct objective hearings in sexual misconduct cases.

6.  I understood from my training that I must fairly consider each case without any predisposition or bias.  I did not understand anything in my training to suggest that I should believe that a sexual assault occurred merely because a complaint was made or that I should believe one party to a complaint over the other party based on anything other than the evidence.  Contrary to what John Doe alleges this lawsuit, I was never trained or told by anyone at JWU that a female complainant almost always tells the truth.

Zmarlicki Decl. at ¶¶ 5-6; see also Brown Decl. at ¶¶ 5-6; Codding Decl. at ¶¶ 5-6; SUF at ¶¶ 27-

33.

Likewise, Mr. Lancey confirmed:

8.  As stated in the training slides, I specifically instructed the panelists of JWU's requirement that they must treat all involved in the student conduct process with respect and always preside in a neutral manner, free of biases, and with an open attitude.  See Exhibit A, presentation slide 13 (JWU 33).

9.  I trained the panelists regarding the requirements and procedures of JWU's Conduct Review Process and provided them with information gathering suggestions to apply when presiding at student conduct hearings.  For example, to ensure fairness to all parties and completeness in the hearing process, I instructed the panelists about the importance of asking "relevant questions to reach a determination—do not assume it happened exactly the way that you read it."  See Exhibit A, presentation slide 17 (JWU 37).

10.  I was especially careful to ensure that the training was presented in a gender-neutral manner with no assumptions, inferences, or statements that a complainant or respondent would be either male or female.  I advised the panelists to review the JWU Sexual Assault and Relationship Violence Policy as well as the Prohibited Discrimination and Harassment Policy which includes definitions related to "sexual harassment" and "sexual assault," available online, and instructed them to review the definitions before the hearing in which they would be serving.  I also advised that the definitions would be available at the hearing.

Declaration of Marshall Lancey at ¶¶ 8-10; SUF at ¶¶ 27-33.

4841-3252-7770.3

### (iii)     The Decision Letter

The Conduct Review Process states that the "student will receive a final written decision, which will set forth the final result and the sanction(s) imposed.  The written decision letter will include information regarding the appeals process and the deadline for filing the appeal." SUF at ¶ 21. All such information was conveyed to Plaintiff in the October 23, 2017, letter stating the result of his hearing and the imposed sanction based upon the findings of responsibility.  Id. at ¶ 125-126.  Plaintiff claims that the decision was wrong, which is essentially an argument seeking appellate review by the Court, which, as addressed below regarding Plaintiff's third alleged breach, is not the Court's role.

### 3.     The Third Alleged Breach

Plaintiff contends "[t]he facts do not support a decision against John Doe even under the 'more likely than not' standard" and seeks the Court's reversal the hearing panel's determination. Compl. at ¶¶ 55-60.  Plaintiff claims that if the panel had properly applied the standard in his view, it should have reached the opposite conclusion, namely that Plaintiff was not responsible for the charged offenses.  In essence, then, Plaintiff requests the Court to engage in a granular examination of the record to find fault with the panel's decision-maker, turning this Court into the type of "super appeals court" that it stated in Brown University that it should not be.  210 F. Supp. 3d at 312-13. Concerning the review of the panel's decision, the analysis is limited to whether or not it was reached in an arbitrary and capricious manner, which it was not.  Id.

Each of the panelists participated neutrally and diligently in understanding and examining the evidence in John Doe's disciplinary case.  They asked probative questions and gave each student party several opportunities to explain and elaborate upon their version of the events.  SUF at ¶¶ 114-125.  The panelists found that Mary Smith was consistently more credible and responsive than Plaintiff, who remained evasive and non-responsive to the panelists' questions and was unable

24

to articulate specific facts supporting that he obtained Mary Smith's consent.  Id. at ¶ 116-117.

The panelists, having engaged in reasoned and careful decision-making, were free to credit the

complainant's accounts and find that it was more likely than not that Plaintiff was responsible for

the sexual misconduct charges.  The Court should not disturb the panel's findings, regardless of

whether the Court may have reached a different result in its own examination of the evidence.

Brown Univ., 210 F. Supp. 3d at 335.  Absent a material procedural error (which did not occur

here), the Court need only find that there was enough evidence, if believed, could have supported

the panel's decision, which is shown in the undisputed evidence to sufficiently exist.  Id; see also

Haidak, 299 F. Supp. 3d at 269 ("[T]he [hearing board's] conclusion was supported by substantial

evidence and involved a credibility determination it was in the best position to make.").

### 4.      The Fourth Alleged Breach

Under the Conduct Review Process, the only two grounds for an appeal are (1) relevant,

new information has come to light since the decision was made and (2) the Conduct Review

Process was not followed.  SUF at ¶ 24.  Plaintiff claims JWU breached its contract with him when

JWU's appeals officer, Marie Bernardo-Sousa, LP.D, JWU's Senior Vice President of

Administration and Enrollment (now the President, Providence campus), affirmed the panel

decision; he alleges new evidence "came to light" that justified the grant of his appeal and the

remand of his disciplinary case for a new hearing.  Compl. at ¶¶ 61-65; SUF at ¶¶ 134-141.

First, Plaintiff references a comment Mary Smith allegedly posted on his Instagram account

on December 10, 2016 (post-dating the two incidents at issue in the disciplinary case), stating "that

looks bomb" with an emoji of fire with the hashtag "#lookatthatstar."  Compl, at ¶ 62.  What

Plaintiff fails to acknowledge is the fact that this was not at all "newly discovered" evidence.  As

Plaintiff admitted in his deposition, he possessed the social media position for nearly 10 months

before the hearing on October 20, 2017.  SUF at 137.  Further, he also admitted that no one at JWU

ever prevented him from offering any evidence that he wished to present at the hearing.  Id.

Second, Plaintiff claims B.K. allegedly made a threat to his physical safety on October 21, 2017, the day after the hearing, which prompted him to obtain a judicial restraining order against B.K.  Compl, at ¶¶ 63-65. B.K.'s alleged conduct toward Plaintiff has nothing to do with JWU or Mary Smith's claim and the evidence she gave regarding sexual assault.  This was not "new evidence" justifying a granting of an appeal under the Conduct Review Process, and JWU appropriately denied Plaintiff's appeal on that basis.

### C.    JWU Did Not Breach The Implied Covenant Of Good Faith And Fair Dealing.

A claim alleging a breach of the covenant of good faith and fair dealing is a claim sounding in contract, not tort, Pride Hyundai, Inc. v. Chyrsler Financial Co., LLC, 263 F. Supp. 2d 374, 394 n. 39 (D.R.I. 2003), and the implied covenant may not be used to rewrite the contract; the implied covenant only requires the parties to perform the obligations actually expressed in the contract. T.G. Plastics Trading Co., Inc. v. Toray Plastics (America), Inc., 958 F. Supp. 2d 315, 327 (D.R.I. 2013).  Good faith and fair dealing "cannot be separated from context," and in evaluating those covenants in the context of private educational contracts, the First Circuit has directed that "courts must afford a school some measure of deference in matters of discipline."  Havlik, 509 F.3d at 35 (citing Gorman, 853 A.2d at 34).

Not every breach of contract necessarily involves a breach of the covenant, "but if there is no breach of contract, then there can be no breach of the covenant."  Honda Corp. v. Polymer Research Corp. of Am., 275 F. Supp. 2d 229, 237 (D.R.I. 2003).  A court's determination that no breach of contract occurred therefore extinguishes a claim for breach of the implied covenant of good faith and fair dealing.  Pride Hyundai, Inc., 263 F. Supp. 2d at 394 n.39.  Because, as discussed above, JWU did not breach any aspect of its educational contract with Plaintiff, no breach of the implied covenant occurred either.

26

Moreover, Plaintiff has not proven a cognizable claim for breach of the implied covenant for additional reasons.  "The applicable standard in determining whether one has breached the implied covenant of good faith and fair dealing is whether or not the actions in question are free from arbitrary and unreasonable conduct."  Ross-Simons of Warwick v. Baccarat, Inc., 66 F. Supp. 2d 317, 329 (D.R.I. 1999), aff'd, 217 F.3d 8 (1st Cir. 2017).  Nothing here comes close to this high standard of proof.  On the contrary, JWU's investigation into the reported sexual misconduct allegations against John Doe and adjudication of the charges hewed exactly to the Conduct Review Process with notice and fairness afforded to both student parties, so the university's implementation of its student conduct process was not arbitrary or capricious.  For this additional reason, JWU is entitled to summary judgment on Plaintiff's breach of the implied covenant of good faith and fair dealing claim.

### D.     Plaintiff's Claim For Negligent Infliction Of Emotional Distress Fails As A Matter Of Law.

At the Rule 12(b)(6) stage, the Court dismissed Plaintiff's claim for intentional infliction of emotional distress "based on the fact that there is not a medically established physical symptomology pled."  ECF No. 36 (Tr. of 5/14/18 Rule 12(b)(6) hearing) at 40:14-18.  Similarly, the absence of such evidence of any physical injury compels the entry of summary judgment in JWU's favor on Plaintiff's negligent infliction of emotional distress claim.  See Jane Doe v. City of Pawtucket, C.A. No. 17-365-JJM-LDA, 2019 WL 1615396, at * 10 (D.R.I. Apr. 16, 2019) (granting Rule 12(b)(6) dismissal because "Rhode Island courts have noted that at least some proof of medically established physical symptomology is needed for a successful negligent infliction of emotional distress claim.") (citing Perrotti v. Gonicberg, 877 A.2d 631, 637 (R.I. 2005); DiBattista v. State, 808 A.2d 1081, 1089 (R.I. 2002)).

27

Further, Count VI of the Complaint contains only a single paragraph alleging that "JWU acted negligently in breach of the duties of case owed to John Doe as set out above." Compl. at ¶ 106. All of the "duties … set forth above" in Plaintiff's Complaint derive from the terms of the Conduct Review Process, which is a part of JWU's educational contract with Plaintiff. Plaintiff has not presented any facts showing how his negligence claim differs at all from his breach of contract claim. The Court must compare John's contract and negligence claims and determine whether they are actually based upon the same alleged duty. Ciccone v. Pitassi, 2004 R.I. Super. LEXIS 150, at *23 (R.I. Super. Aug. 13, 2004) (Silverstein, J.) (citation omitted). If the two claims are based upon the same duty, the negligence claim cannot survive. Id. Plaintiff has not alleged any separate and independent duty owed to him in tort that is distinct from the terms of his educational contract with JWU.

In Trustees of Boston College, the First Circuit upheld the entry of summary judgment in the college's favor on a negligent infliction of emotional distress claim brought by a plaintiff challenging a contractual disciplinary process, depicting such a negligence claim as a "nonstarter." 892 F.3d at 93-95 (applying Massachusetts law, which is materially similar to Rhode Island law); see Doe v. Amherst Univ., 238 F. Supp. 3d 195, 229 (D. Mass. 2017) (dismissing negligent infliction of emotional distress claim because "the College did not owe Doe a duty in tort, as opposed to its contract with students, to ensure compliance with the terms of the Student Handbook") (applying Massachusetts law); Faiaz v. Colgate Univ., 64 F. Supp. 3d 336, 362 (N.D.N.Y. 2014) ("simply alleging a duty of care does not transform a breach of contract [claim] into a tort claim") (applying New York law). The same justification applies here under Rhode Island law and compels entry of summary judgment in JWU's favor as to Count VI alleging negligent infliction of emotional distress.

4841-3252-7770.3

**E.       Plaintiff's Claim For Declaratory Judgment Fails As A Matter of Law.**

In Count VII (Complaint at ¶ 110), John Doe requests various declarations from the Court.

A declaratory judgment is not a separate substantive source of rights, and the "operation of

Declaratory Judgment Act is procedural only."  Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S.

667, 671 (1950) (citation omitted); see Akins v. Penobscot Nation, 130 F.3d 482, 490 n.9 (1st Cir.

1997) (Declaratory Judgment Act does not, by itself, create a substantive cause of action).  Because

Plaintiff's Title IX, contract, and tort claims fail as a matter of law, John is not entitled any

declaratory relief from the Court, and summary judgment must enter in the University's favor on

this claim.

## CONCLUSION

JWU requests that the Court grant the University's Motion for Summary Judgment as to

all remaining claims in Plaintiff's Complaint, including Counts I, III, IV, VI, and VII.  The Court

should enter a Final Judgment in JWU's favor on these claims as well as the claims previously

dismissed at the Rule 12(b)(6) stage (Counts III, V, and VI as to the claim for injunctive relief).


                                        JOHNSON & WALES UNIVERSITY
                                        By its Attorneys,

                                        /s/ Steven M. Richard
                                        /s/ Jeffrey S. Brenner
                                        _____
                                        Steven M. Richard (#4403)
                                        Jeffrey S. Brenner (#4539)
                                        Nixon Peabody LLP
                                        One Citizens Plaza, Suite 500
                                        Providence, RI  02903
                                        Tel: (401) 454-1020
                                        Fax: (401) 454-1030
                                        srichard@nixonpeabody.com

Dated:  June 14, 2019

<u>CERTIFICATE OF SERVICE</u>

I certify that on the 14th day of June, 2019, I filed and served this memorandum via the Court's CM/ECF system.

/s/ Steven M. Richard

4841-3252-7770.3