UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JOHN DOE,                                       ) | |
| )| |
| Plaintiff,                   ) | |
| )| |
| v.                                            ) | Civil Action No. 18-cv-106-JJM-LDA |
| )| |
| JOHNSON & WALES UNIVERSITY,     ) | |
| )| |
| Defendant                    ) | |

**PLAINTIFF'S VERIFIED OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT
and PLAINTIFF'S REQUEST FOR HEARING**

Now comes the Plaintiff, John Doe ("Doe"), by counsel, and respectfully opposes the

Motion for Summary Judgment ("Motion") filed by the Defendant, Johnson & Wales University

("JWU").  The Motion seeks the dismissal of Counts I (Breach of Contract), II (Breach of

Covenant of Good Faith and Fair Dealing), Count IV (Title IX – 20 U.S.C. § 1681), VI

(Negligent Infliction of Emotional Distress) and VII (as to Declaratory Judgment).  In support of

this Opposition, Doe states the following:


**Introduction**

As stated in the underlying Complaint and in Doe's Opposition to JWU's previous

Motion to Dismiss under Rule 12(b)(6), Doe's Complaint arises from the actions taken by JWU

against Doe in October and November of 2017.

In the Fall of his Junior year, he was accused of having committed sexual assault, when

as a sophomore, he had engaged numerous times in consensual sex with a female student, Mary

Smith ("Smith" - a pseudonym for purposes of this litigation), who suddenly now claimed to

have withdrawn her consent during the course of the sexual conduct.  In just five weeks from the date the complaint by Mary Smith was filed against him with JWU, Doe was found guilty of sexual assault, expelled from JWU, removed from campus and branded a sex offender, with his future in ruins.

JWU's actions against Doe were the direct result of a foundationally flawed and biased process of investigation and discipline in which Doe was denied the most basic elements of fairness promised to him by JWU in its Student Handbook and required by law. JWU attempted to have the core claims of the Complaint dismissed under Rule 12(b)(6) and failed.[1]

The underlying facts of the Complaint and what Doe suffered have not changed since the denial of the Rule 12(b)(6) Motion.  Indeed, the only thing that has occurred over the past year is that case law throughout the nation has increasingly found to be suspect Title IX disciplinary procedures similar to JWU's and increasingly supportive of this Honorable Court's previous determination.[2]

---

[1]  Indeed, this Honorable Court gave an oral ruling denying the Motion to Dismiss most of the Complaint's counts stating that, "I can't for the life of me find any other explanation for why this - - why John Doe was disciplined based on the allegations that are set forth in that Complaint. And the only possible inference one could draw from it is that there was some element of gender-based decision making that went on there because if all of the allegations are believed, there's no other explanation that is before the Court for that." (ECF docket no. 36, page 10, lines 11-18)

[2] JWU in its Motion states that "at the trial court level, federal district courts are routinely entering summary judgment in favor of colleges and universities on Title IX claims challenging disciplinary processes." This is simply incorrect. Please see the following examples of some cases evidencing the denial of motions for summary judgment or motions to dismiss in whole or in part. Young men are suffering injustice under the present Title IX regime, and federal courts are pushing back forcefully now:  Haidak v. University of Massachusetts, Case No. 18-1248 (1st Cir, August 6, 2019); Doe v. Purdue University, Case No. 17-3565 (7th Circuit, June 28, 2019); Doe v. Trustees of Boston College, 892 F.3d 67 (1st Cir. 2018); Doe v. Miami University, 882 F.3d 579 (6th Cir, 2018); Doe v. Quinnipiac University, Case No. 3:17-cv-364 (D.Ct., July 10, 2019); Doe v. Grinnell College, Case No. 4:17-cv-00079 (S.D.Iowa, July 9, 2019); Doe v. University of Notre Dame, Case No. 3:17-cv-00298 (N.D. Indiana, May 8, 2017); Doe v. The

### Standard of Review

The First Circuit Court of Appeals has stated that Summary Judgment is only proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. A fact is material when it has potential of changing a case's outcome." Doe v. Trustees of Boston College, 892 F.3d 67 (1st Cir. 2018).  Additionally, "a dispute is genuine when the evidence about the fact is such that a reasonable jury would resolve the point in favor of the nonmoving party." Rivera –Muriente v. Agosto-Alicia, 959 F.2d 349, 352 (1st Circ. 1992).  Lastly, "if there is a genuine dispute of a material fact, that dispute would need to be resolved by a trier of fact." Doe v. Trustees of Boston College, 892 F.3d 67, 79 (1st Cir. 2018);

### Relevant Undisputed Material Facts[3]

1.   The proceeding by JWU against John Doe which gives rise to this lawsuit formally began in September of 2017 when Mary Smith filed a formal Complaint ("Complaint Report") with JWU accompanied by her boyfriend BK (a pseudonym for purposes of this lawsuit). Gray Decl.; Pl.Comp.

2.   JWU *never did and would not* give a copy of the formal 18+ page Complaint Report to John Doe and only read it to him in a single pre-disciplinary Hearing meeting with Betsy Gray (the JWU "Director of Student Conduct & Program").  Indeed, JWU refused to give a copy of the Complaint Report to the undersigned counsel when his office requested it when he began

---

Ohio State University, 219 F. Supp.3d 645 (S.D. Ohio, November 7, 2016); Doe v. Rhodes College, Case No. 2:19-cv-02336 (W.D. Tenn, June 14, 2019).

[3]For efficiency purposes and because many of the exhibits are already under seal John Doe will be referencing exhibits as filed by the Plaintiff. John Doe will utilize the exhibit references via bates-stamp numbers when necessary.  If John Doe is referencing an exhibit he has filed with his Opposition, he will indicate such. If John Doe is referencing his verified complaint, such will be indicated.  The verified complaint, of course, is not being attached as an exhibit as it is already on the docket.

representing John Doe in his internal appeal of his expulsion.  Undersigned counsel was forced

to have it read to him telephonically and told to take notes to the best of his ability.  The

undersigned facts and quotes come from that report. It is this report that guided the Hearing.

Gray Decl; Pl. Comp;

3.   JWU failed to make *any oral or written record whatsoever* of the Hearing which

occurred against John Doe. Gary Decl; Pl. Comp.

*Mary Smith and John Doe's relationship*

4.   Mary Smith and John Doe had become friends since the beginning of the 2016 school

year and spent time together.  They never dated and, as Mary Smith stated, they were "friends

with benefits." They began having consensual sex together soon thereafter.   It also appears that

she was dating BK at the same time she was sleeping with John Doe. John Doe had no

knowledge of this dating relationship. They had sex together a total of six times.  Four of those

times occurred at John Doe's dorm and two at her dorm.  These sexual encounters occurred

during September and October of 2016. Gray Decl; Pl. Comp.; JWU campus police reports

(Exhibits L-P: bates-stamp nos. 131-148; Exhibits H-J: bates-stamp nos. 131-137 and 1151-

1170).

*Asserted sexual assault incident 1 as stated by the complainant Mary Smith (sex session 5)*

5.   Mary Smith on or about September 13, 2017 reported to the JWU security office that

she had been sexually assaulted.  She stated that this assault occurred "one night in October" *of*

*2016* by John Doe. She stated that she had slept with John Doe earlier that night in his dorm

room, was sleeping with him in bed, and woke up to go to the bathroom in the middle of the

night. While in the bathroom she said that John Doe followed her into the bathroom pulled down

her underwear and had sex with her up against the sink, leaving her with bruising on her hip.
She said that this sexual encounter was rougher than she was used to having with him because
John Doe was "normally gentle with her" when they had sex. Gray Decl; Pl. Comp.; JWU
campus police reports (Exhibits L-P: bates-stamp nos. 131-148; Exhibits H-J: bates-stamp nos.
131-137 and 1151-1170).

6.   After they finished having sex in the bathroom, Mary Smith and John Doe went back
into John Doe's bed and fell asleep together *again*.  She woke up later that morning and left the
room.  As stated in the Complaint Report, one of John Doe's roommates was in the room when
this alleged sexual assault occurred and heard nothing.  Additionally, according to the Complaint
Report, another roommate was walking in when Mary Smith was leaving the building and she
seemed to be in good spirits. Gray Decl; Pl. Comp.; JWU campus police reports (Exhibits L-P:
bates-stamp nos. 131-148; Exhibits H-J: bates-stamp nos. 131-137 and 1151-1170).

7.   Mary Smith never took pictures of any bruising, never contacted any official
regarding the incident and never went to any medical facility. Gray Decl; Pl. Comp.; JWU
campus police reports (Exhibits L-P: bates-stamp nos. 131-148; Exhibits H-J: bates-stamp nos.
131-137 and 1151-1170).

*Asserted sexual assault incident 2 as stated by the complainant Mary Smith (sex session 6)*

8.   Approximately a week after this alleged first sexual assault by John Doe, Mary Smith
*voluntarily came over* to John Doe's dorm room *again* to have sex with him.  She stated in the
Complaint Report that she began having "consensual sex" with John Doe but stated that "it was
normal at first and not rough and at some point during the consensual sex she became less
lubricated and it started to hurt." She "voiced this to John Doe and gave him the chance to stop

and change positions to see if it continued to hurt. She stated that he moved her onto her hands and knees and continued having sex." It did not hurt anymore in that position but "began to hurt again" and he only stopped when he ejaculated. Gray Decl; Pl. Comp.; JWU campus police reports (Exhibits L-P: bates-stamp nos. 131-148; Exhibits H-J: bates-stamp nos. 131-137 and 1151-1170).

9.   It is undisputed that the events relayed in Paragraphs 5 and 8 are what the entire assertion of "sexual assault" against John Doe comprises as stated by Mary Smith.  Nothing more.  Gray Decl; Pl. Comp.; JWU campus police reports (Exhibits L-P: bates-stamp nos. 131-148; Exhibits H-J: bates-stamp nos. 131-137 and 1151-1170).

10. When she made the formal complaint *approximately a year later*, as stated in the Complaint Report, Mary Smith said that she was not sure it was sexual assault that occurred. She said that "she was confused because he had never gotten rough with her like that before and that she was not sure if what occurred was considered sexual assault. She stated that 'this type of sex was new to her.'"[4] Gray Decl; Pl. Comp.; JWU campus police reports (Exhibits L-P: bates-stamp nos. 131-148; Exhibits H-J: bates-stamp nos. 131-137 and 1151-1170).

11. Soon after this asserted second incident of sexual assault occurred, Mary Smith was on social media platform Instagram liking John Doe's postings.Pl. Comp.; (Exhibit W – John Doe appeal letter drafted by atty. Ehrhard, bates-stamp nos. 245 – 274).

*JWU begins flawed Investigation of John Doe*

12. On or about June 1, 2017 (approximately 8 months after the alleged incidents

---

[4] John Doe has denied from the beginning that any "sexual assault" occurred and that sex session 6 was not distinct from session 1 through 4. He further has always claimed that the bathroom sex (session 5) never even happened.

occurred), Mary Smith's boyfriend, BK, on his own volition and without any knowledge of Mary Smith went to the JWU security office and stated that his girlfriend "was sexually assaulted on 2 separate occasions during the prior school year."  BK further stated that he and Mary Smith had been dating "exclusively since January of 2017" but had been in a "relationship" prior to that. Gray Decl; Pl. Comp.; JWU campus police reports (Exhibits L-P: bates-stamp nos. 131-148; Exhibits H-J: bates-stamp nos. 131-137 and 1151-1170).

13. BK stated that she was assaulted in "late September to early October" but that she never wanted "to get into any details" with him about it. BK stated that he just "found out about the sexual assault in April or May." BK also stated that he never told Mary Smith that he was going to report anything. BK also stated that Mary Smith would be moving into his apartment for the upcoming school year (beginning in August/September 2017). Officer Eastman of JWU security stated that he was obligated to investigate. Gray Decl; Pl. Comp.; JWU campus police reports (Exhibits L-P: bates-stamp nos. 131-148; Exhibits H-J: bates-stamp nos. 131-137 and 1151-1170).

14. BK stated that he did not know the precise name of the person who assault his girlfriend but that his first name was "John Doe" and the dorm that John Doe had lived in. Gray Decl; Pl. Comp.; JWU campus police reports (Exhibits L-P: bates-stamp nos. 131-148; Exhibits H-J: bates-stamp nos. 131-137 and 1151-1170).

15. Sgt. Robinson of JWU security proceeded to reach out to Mary Smith and John Doe regarding this alleged complaint filed by BK. Gray Decl; Pl. Comp.; JWU campus police reports (Exhibits L-P: bates-stamp nos. 131-148; Exhibits H-J: bates-stamp nos. 131-137 and 1151-1170).

16. Sgt. Robinson spoke telephonically with Mary Smith regarding what allegedly occurred. She stated, as relayed in the Complaint Report, that "she did not want to talk about it at the moment." Sgt. Robinson persisted and asked if she "would validate the complaint." Mary Smith would not do so and said that "she had to go." Gray Decl; Pl. Comp.; JWU campus police reports (Exhibits L-P: bates-stamp nos. 131-148; Exhibits H-J: bates-stamp nos. 131-137 and 1151-1170).

17. Sgt. Robinson proceeded to email Mary Smith on June 2, 2017, informing Mary Smith that she was "a victim of sexual assault this past academic year (2016-2017)" and that he "would like her to know that we are here to support you". Mary Smith responded to that e-mail on June 7, 2017 thanking Sgt. Robinson "for reaching out to her" and that "she did not need any help." Gray Decl; Pl. Comp.; JWU campus police reports (Exhibits L-P: bates-stamp nos. 131-148; Exhibits H-J: bates-stamp nos. 131-137 and 1151-1170).

18. Sgt. Robinson also reached out to John Doe who unequivocally denied that a sexual assault had occurred. Gray Decl; Pl. Comp.; JWU campus police reports (Exhibits L-P: bates-stamp nos. 131-148; Exhibits H-J: bates-stamp nos. 131-137 and 1151-1170).

*Mary Smith moves in with BK, Complaint suddenly moves forward and John Doe is expelled with exceptional speed*

19. On or about September 13, 2017, Mary Smith with BK went to the JWU security office and asked to bring a formal complaint against John Doe as a consequence of sex sessions 5 and 6. She relayed the events to have occurred as delineated in the Complaint Report. Gray Decl; Pl. Comp.; JWU campus police reports (Exhibits L-P: bates-stamp nos. 131-148; Exhibits H-J: bates-stamp nos. 131-137 and 1151-1170).

20. BK proceeded to state that he first learned about the asserted sexual assaults when he saw the bruises on Mary Smith. Mary Smith never explained why her story changed from June to September (and no inquiry was even attempted by JWU). But Mary Smith did state that the alleged assaults had changed her life in one way – "it had affected her relationship with her boyfriend" (BK). Gray Decl; Pl. Comp.; JWU campus police reports (Exhibits L-P: bates-stamp nos. 131-148; Exhibits H-J: bates-stamp nos. 131-137 and 1151-1170).

21. John Doe was never given copies of the JWU police reports and was never informed of BK's involvement in the complaint or Mary Smith's assertions how her relationship with BK was suffering. Gray Decl; Pl. Comp.; JWU campus police reports (Exhibits L-P: bates-stamp nos. 131-148; Exhibits H-J: bates-stamp nos. 131-137 and 1151-1170).

22. John Doe proceeded to receive a letter dated September 29, 2017 from Betsy Gray (Director of Student Conduct and Programs at JWU) informing him that he was "being charged" with "Sexual Assault (including rape, fondling, incest and statutory rape)" and "Sexual harassment". Gray Decl.; Pl. Comp.

23. On October, 3, 2017, John Doe appeared at a "Pre-Hearing Conference".  This Conference meeting is the only time that John Doe was actually told what the specific charges in the Complaint Report were against him.  But John Doe was not allowed to read the Complaint Report, see a copy of it, or have any copy of it whatsoever. Gray Decl.; Pl. Comp.

24. At the Pre-Hearing Conference he was told that he must attend a Hearing on the charges on October 20, 2017.  He was never told how the Hearing was conducted.  He was never told how and if he could question any witnesses, bring any witnesses, bring and/or submit any evidence, whether there would be opening statements or closing statements.  In essence, he was

left in the dark about the entire procedure.  The one thing he was told was that he could have an "Advisor" who could not participate in any way during the Hearing but could sit next to him.  He also was never told the names of the three adjudicating Panelists. He was specifically told that he could not have any legal counsel. Gray Decl.; Pl. Comp.

25. John Doe was simply told that the procedure would follow the JWU Student Code of Conduct ("SCC") and its Conduct Review Process ("CRP"). Gray Decl.; Pl. Comp.

34. On October 20, 2017, John Doe was placed into an expulsion Hearing. Gray Decl.; Pl. Comp.

35.    John Doe had two roommates. Gray Decl; Pl. Comp.; JWU campus police reports (Exhibits L-P: bates-stamp nos. 131-148; Exhibits H-J: bates-stamp nos. 131-137 and 1151-1170).

36.    At least one of the roommates was in the room when the asserted sexual assault occurred in the bathroom. Gray Decl; Pl. Comp.; JWU campus police reports (Exhibits L-P: bates-stamp nos. 131-148; Exhibits H-J: bates-stamp nos. 131-137 and 1151-1170).

37,    The roommate never heard anything occur. Gray Decl; Pl. Comp.; JWU campus police reports (Exhibits L-P: bates-stamp nos. 131-148; Exhibits H-J: bates-stamp nos. 131-137 and 1151-1170).

38.    The roommates were never summoned or made to be witnesses at the disciplinary Hearing. Gray Decl; Pl. Comp.; JWU campus police reports (Exhibits L-P: bates-stamp nos. 131-148; Exhibits H-J: bates-stamp nos. 131-137 and 1151-1170).

39.    On October 23, 2017, John Doe received a letter stating that the three adjudicating Panelists has ruled that he had committed sexual assault and he was expelled.  Gray Decl.; Pl. Comp.

40.    John Doe was given only three days to appeal and, according to the CRP, only if "Relevant, new information has come to light since the decision was made" and/or "The Conduct Review Process, as outlined, was not followed. Gray Decl.; Pl. Comp.

41.    John Doe, with a limited extension, filed his appeal with counsel.  It was denied within a few hours by JWU's Senior Vice President of Administration with no apparent review. Gray Decl.; Pl. Comp. Exhibit W – John Doe appeal letter drafted by atty. Ehrhard, bates-stamp nos. 245 – 274; e-mails to Mary Bernardo Sousa – bates stamp nos. 874-878 (confidential info in e-mails – i.e. names of John Doe and Mary Smith – not filed with court). Exhibit X – appeal denial letter, bates-stamp no.275.

42. Sixty (60) JWU students have faced a disciplinary Hearing for sexual assault claims since February 23, 2015. Over four (4) out of every five (5) JWU students punished by JWU through its Title IX disciplinary systen for sexual assault and/or sexual harassment have been males.(data chart provided by JWU).

Further Summary of Facts

Mary Smith stated that she had consensual sex with John Doe approximately six times over a six to seven-week period of time during September through November, 2016.  Two of the sexual intercourse experiences occurred at her dorm-room and the remaining events occurred at John Doe's dorm-room.  The complainant conceded that every single time she consented to the sex and that he was, using her words, "a gentle" sex partner.  Two of the times (experiences 5 & 6) she stated that the sex was far rougher than she claims she was used to with John Doe.

The *only* facts in dispute were the nature of those two sexual intercourse sessions (5 & 6), nothing more. Mary Smith stated that during the fifth experience of sexual intercourse, John Doe came into the bathroom and with force had sexual intercourse with her facing forward in the

bathroom causing her bruising. She stated that she was not used to having "rough sex" like this with John Doe and did not know how to react to it.  John Doe for his part says that the sexual intercourse never happened like that.

What is *not* in dispute about that fifth sexual intercourse session (even if it did happen at all) is that Mary Smith had had sex with John Doe very soon before the alleged fifth sex in the bathroom that night and had fallen asleep in John Doe's bed after that fourth sex session.  It is also not in dispute that Mary Smith voluntarily went right back into John Doe's bed and fell asleep with him after the alleged "rough sex" in the bathroom.  It is also not in dispute that at least one of John Doe's roommates was in the same dorm-room when the alleged fifth session "rough sex" occurred in the bathroom. It is also not in dispute that another roommate saw Mary Smith leave John Doe's room later that morning and she seemed to be in very good spirits.

 And, very importantly, it is not in dispute that Mary Smith went back over to John Doe's dorm-room approximately one week after the alleged "rough sex" fifth session and voluntarily and consensually had sex with John Doe *again* (this is the alleged sixth sex session – and the second incident of sexual assault).  It is not in dispute that she had consensual sex with John Doe. Her only alleged complaint was that mid-way through the sex it began to "hurt" and she wanted him to change positions.  It is undisputed that John Doe changed positions as she requested and finished the sex.

The CRP specifically states that relevant new evidence is a basis for appeal and should lead to a new Hearing.  John Doe in his appeal procured an Instagram posting from a few weeks after the so-called second sexual assault occurred (the sixth sexual intercourse session) wherein Mary Smith on her own volition liked a posting John Doe put on-line of a meal he prepared.  On

December 10, 2016, she wrote "that looks bomb" with an emoji of fire with "#lookatthatsear" after it.

If the fifth and sixth sexual sessions were indeed sexual assaults, it is not reasonable that the complainant would reach out on her own to communicate with John Doe in a jovial friendly manner.  But she did because the alleged incidents were not sexual assaults.

Additionally, BK threatened the life of John Doe on October 21, 2017 (the day after John Doe's JWU hearing).  Since that time, a restraining Order issued against BK in favor of John Doe. (See Pl. Comp.; Exhibit W – John Doe appeal letter drafted by atty. Ehrhard, bates-stamp nos. 245 – 274

BK's actions are extremely relevant because it is BK who had been with Mary Smith since she came to campus security in September to file a complaint against John Doe and BK was her "Advisor" at the Hearing.

As the Complaint Report says, Mary Smith stated without equivocation in June of 2017 that she was fine and had no complaint against John Doe.  But, starting in September when she moved in with BK, the complainant suddenly determined that she had been assaulted and came to campus security. When asked how the alleged assaults had affected her, Mary Smith stated that it "had affected her relationship with her boyfriend" (BK).  Had John Doe been allowed to question BK, it would have revealed if BK had actually unduly influenced the testimony of Mary Smith.  BK has revealed a high level of violent uncontrolled behavior and his effect upon the proceedings against John Doe were of core relevance, but such information was never given to John Doe by JWU.

13

## ARGUMENT

### This Honorable Court's Important Role in Reviewing Disciplinary Decisions

JWU in its Motion waves off the importance of judicial review of non-academic disciplinary decisions by stating that this Honorable Court should only play a limited role in "reviewing disciplinary decisions."  JWU in its Motion seems to purposefully ignore the fact that students in Rhode Island have a property and liberty interest in their education.  And this interest cannot be taken away or denied without proper due process.

The First Circuit Court of Appeals has stated that, "it has long been clear that, though states have broad authority to establish and enforce codes of conduct in their educational institutions, they must 'recognize a student's legitimate entitlement to a public education as a property interest which is protect by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause.'" Haidak v. University of Massachusetts, Case No. 18-1248 (1st Cir, August 6, 2019) at page 15, 2nd paragraph (quoting Goss v. Lopez, 419 U.S. 565,574 (1975)).  See also Doe v. Purdue University, Case No. 17-35656 (7th Circuit, June 28, 2019).

In essence, a failure by JWU to properly ensure that John Due received a fair and equitable process leading to his expulsion means that such discipline inherently violates and implicates John Doe's due process rights, which this court is bound to protect.

### Count IV -Doe's Title IX Claim Should as a Matter of Law Proceed to a Trier of Fact and Not Be Dismissed

JWU's singular argument in its Motion to dismiss Doe's Title IX claim (which is actually summarized on page 6 of its Motion in the last paragraph) is that (1) "there is no evidence suggesting any error that casts doubt upon the outcome of Plaintiff's disciplinary case, so

14

Plaintiff's Title IX claim fails at the first prong of the erroneous outcome framework" and (2)

fails on the second prong because  "the record is devoid of any proof demonstrating 'that there

was a causal connection between the outcome of Doe's disciplinary proceedings and gender

bias'" JWU is simply wrong on both prongs of its argument.

As a threshold matter, a trier of fact (i.e. jury) quite reasonably and rationally (and most

probably) would determine that Mary Smith's factual complaint on its face is not credible.

Taking the facts as stated _by_ Mary Smith (the complainant ) at face value (which John Doe did

not and does not) and relayed in JWU's _own report_ (which, as stated before, Doe was not

actually given), sexual intercourse sessions 5 & 6 do not rise under any standard as acts of sexual

assault or harassment.

It is simply unreasonable to believe that the complainant Mary Smith suffered an assault

during consensual sex and then very soon after voluntarily entered into further consensual sexual

intercourse.  It is unreasonable to believe that John Doe's roommates would not hear anything

occurring (even Mary Smith admits that at least one of them was in the room). And it is not

reasonable for the complainant to go back to sleep with John Doe in his bed after the alleged

sexual assault (i.e. sexual intercourse session 5) when she could have easily left the room.

Additionally, the Complaint Report stated without equivocation that Mary Smith specifically

sent an e-mail message to Sgt. Robinson on June 7, 2017, thanking "him for reaching out to her"

and "indicating that she did not need any help." No jury would rule in the manner that the biased

JWU panel did.

The above undisputed "facts" which are JWU's and Mary Smith's *own recitation of

events*, and which the Hearing Panelists relied upon in their ruling, on their face amount to

"evidence suggesting " an "error that casts doubt upon the outcome of Plaintiff's disciplinary

case". That is the irony of this whole lawsuit; JWU's own facts belie the failure of their

procedure. And no amount of page upon page upon page of breathless pleading from JWU can

change that foundational error. A jury by right should hear these "facts" and determine (as JWU

asserts in its Motion) whether the "evidence" suggests "any error that casts doubt upon the

outcome of Plaintiff's disciplinary case."

The second prong asserted by JWU (i.e. the causal connection prong) is a red herring.

JWU, in essence, is arguing that even if the facts show that an error did indeed occur in the

ruling of the JWU Hearing Panel, no evidence exists that implies that it was based on "gender

bias". JWU's second prong argument is flawed for two reasons. And, quite frankly, new case

law advises that such structure is irrelevant anyways.

**First**, there is clear evidence pointing to a gender bias and JWU's argument fails on that

fact alone. There is the threshold matter, as discussed extensively earlier in this Opposition, that

the complainant Mary Smith's asserted claims are simply not reasonable and the only reason to

find in her favor under her own facts is inherent bias.

Further, since February 23, 2015, there have been sixty (60) Hearings conducted by JWU

under it biased system of adjudication of sexual assault claims. Only twelve of those Hearings

have had females as the accused. Over four out of every five accused students who have faced a

JWU Hearing Panel for sexual assault have been male.

Additionally, JWU's own training materials belie the inherent bias in the training and

decision making of JWU's Title IX officers and panelists. Indeed, the power-point section that

JWU used in training the panelists under the section "Identifying Our Own Biases" uses under

"victim blaming" the phrases, "- What was she thinking when…." and "- What did she think was

going to happen?".  Nowhere else is the pronoun 'she' exclusively used in the training materials. (See attached Exhibit A).

Even further, the evidence shows that JWU trains its panelists and Title IX officers under the philosophy of "Trauma Informed Response" which focuses on the female victim and feminist theory. Claire K. Hall was the Director of Student Conduct and Special Advisor to Student Services at JWU from October 2009 through December 2015 and is currently a principal at Universal Education Compliance & Training. She is a leading expert in Trauma-Informed Sexual Assault Investigation. (See attached Exhibit B).

Even more disturbing, from the beginning of the investigation JWU assumed that Mary Smith was telling the truth and was presumed to be a victim. John Doe was assumed to be at fault. Sgt. Robinson of JWU campus security, the initial primary *investigating officer*, does not even deny this fact.  He wrote in the 18+ page Complaint Report that he e-mailed Mary Smtih on June 2, 2017, the following as his initial communication:  "I tried reaching out to you earlier but I was unable to leave a voice message.  I emailed you instead.  I did not want to delay this matter any longer so I am supplying you with some resources as it has been brought to my attention that you were a victim of sexual assault this past academic year (2016-2017).  I want you to know that we are here to support you…"

Any reasonable good faith investigation does not begin with the primary investigator stating that "you were a victim of sexual assault" as Sgt. Robinson does and pledge his support. Balance and reasonableness requires a statement such as "a complaint regarding an asserted incident of sexual assault was filed" (or some derivation therein).  Further, the Complaint Report reveals that when Sgt. Robinson first spoke with Mary Smith, she said that "she did not want to talk about it" and that she was "ok".  Sgt. Robinson, rather than even discussing the nature of the

complaint or facts in response to the complainant's denials, simply persisted and stated to the complainant that "she would validate the complaint."  Objectivity be damned, apparently.[5]

It should also be noted that John Doe's disciplinary Hearing and Title IX claim occurred against the backdrop of a 2011 "Dear Colleague" letter from the U.S. Department of Education to colleges and universities, including JWU. Under the guidelines of this Letter, JWU would be in danger of losing federal education funds if it did not vigorously enforce and increase its prosecutions of sexual assaults. John Doe was on the receiving end of this witch-hunt against men. The 6th Circuit Court of Appeals has cited this Letter as helping support "a reasonable inference of gender discrimination." See Doe v. Baum, 903 F.3d 575, 586 (6th Cir. 2018); See also Doe v. Miami, 882 F.3d 579 (6th Cir. 2018). A copy of the Letter can be found at

*https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf*

**Secondly**, and very importantly, case law on the framework for determining Title IX claims has moved beyond the confines of an erroneous standard framework. The Doe v. Purdue University, Case No. 17-3565 (7th Circuit, June 28, 2019) decision, issued very recently by the U.S. Court of Appeals for the Seventh Circuit, is in many respects the guiding case on modern Title IX jurisprudence.

In the Doe v. Purdue University case, a unanimous panel wrote that, "We see no need to superimpose doctrinal tests on the statute. All of these categories simply describe ways in which

---

[5] JWU curiously relies on self-serving affidavits from Sgt. Robinson, the three Hearing Panelists and Betsy Gray in its Motion.  None of the affidavits actually provide any new insight but simply parrot the legal arguments of JWU. That people who made a biased decision – people who are, critically, at-will employees of the defendant JWU – are willing to claim they didn't make a biased decision in self-serving affidavits is hardly surprising. After all, to coin a phrase, they are rather biased witnesses on the subject of their possible bias. See also Doe. V. Ohio State Univ., 311 F. Supp. 3d 881 (S.D. Ohio 2018) where the court was skeptical because the affidavits did not cure the underlying procedural problems in the case (much in like in the present case before this Honorable Court).

a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student. We prefer to ask the question more directly: do the alleged facts, if true, raise a plausible inference that the university discriminated against John 'on the basis of sex?'" <u>Doe v. Purdue University</u> at page 25, para. 2.  And the answer to that question under the facts of the present case before this Honorable Court is a resounding, "Yes".  This Honorable Court literally said as much in its previous oral decision denying the Motion to Dismiss most of Doe's claims. (See page 2 of this Opposition, footnote 1)

Notably, JWU references numerous times in its Motion the recent First Circuit case of <u>Doe v. Trustees of Boston College</u>, 892 F.3d 67 (1st Cir. 2018) which was released prior to the 7th Circuit's <u>Doe v. Purdue University</u> decision.  The <u>Doe v. Trustees of Boston College</u> decision specifically states that, "Neither the Supreme Court nor this Circuit have adopted a framework for analyzing claims by students challenging a university's disciplinary procedures as discriminatory under Title IX. *We need not establish one at this moment*." <u>Trs. of Boston Coll</u> at 90 (emphasis added by John Doe).

The 7th Circuit's <u>Doe v. Purdue University</u> decision flows naturally from the 1st Circuit's <u>Doe v. Trustees of Boston College</u> decision.  Indeed, this Honorable Court District Court  has repeatedly looked favorably upon the Second Circuit's opinion in <u>Doe v. Columbia University</u>, 831 F.3d 46 (2nd Circ. 2016) which promulgated in essence an expanded framework merging procedural rights in Title VII cases with Title IX cases.  The 7th Circuit's <u>Doe v. Purdue University</u> decision simply expands upon that line of thinking.

**Count I - Doe's Breach of Contract Claim Should Proceed to a Trier of Fact**

The First Circuit Court of Appeals has opined that, "in reviewing a student's breach of of contract claim against his or her university, we employ a reasonable expectations standard in interpreting the relevant contracts. We must ask 'what meaning the party making the manifestation, the university, should reasonably expect the other party, the student, to give it'" Doe v. Trustees of Boston College at 80 (quoting Shaer v. Brandeis Univ., 735 N.E.2d 373, 378 (Mass. 2000)).  The First Circuit continued by stating that "in the context of disciplinary hearings, we review the procedures followed to ensure that they fall within the range of reasonable expectations of one reading the relevant rules. If the facts show that the university has failed to meet the student's reasonable expectations, the university has committed a breach." Id.

Nearly every aspect of JWU's disciplinary proceeding violated the contract between John Doe and JWU as delineated in the Student Code of Conduct and, further, in the inherent right of due process Doe retained therein.

*JWU's Conduct Review Process*

The CRP states, among other provisions, the following. It is this statement which foundationally guides the CPR:

> "The university administers the Conduct Review Process in good faith, making every reasonable effort to be fair to all involved."

At the Hearing on a complaint, the following are the only statements regarding any actual procedure used at such a Hearing as delineated in the CRP:

> The "panel will outline the process"; "review the incident report and/or allegations, and any supplemental information"; "hear any statements relating to the incident"; "hear or review the statements of witnesses with personal, relevant

information of the incident (but other witnesses, such as character witnesses, will not be not be allowed to attend or be heard)"; and "hear or review the statements of other relevant witnesses (and where confidentiality is a consideration, the identity of such witnesses will not be disclosed to the student)"

As to sexual assault and harassment claims, the CRP specifically states the following regarding the "rights" of all parties to a complaint:

"The right to an investigation and resolution that is prompt, fair and impartial from the initial investigation to the final result as required by applicable law"

"The right to a hearing conducted by unbiased university officials who receive annual training on issues related to sexual harassment, sexual assault, sexual exploitation, dating violence, domestic violence and stalking, and how to conduct an investigation."

"The right to a hearing process that protects the safety of the parties and promotes accountability.  Hearing officers and panels use the 'more likely than not' standard to evaluate alleged violations."

"The right to present relevant materials and witnesses with personal, relevant knowledge of the incident as outlined above."

"The right to be accompanied to the hearing and any related meeting by an advisor of their choice.  The advisor may accompany the student, but may not participate in any manner.  If there is a legitimate conflict of interest related to the advisor, Student Conduct reserves the right to disqualify an advisor."

. The conduct review process under its own terms is supposed to be, at the very least, impartial and balanced such that the burden is not shifted against and onto the accused.  It is supposed to be a "good faith" proceeding which provides a fair, delineated and honest chance for the accused to defend himself from the charges leveled against him for sexual assault and sexual harassment.  A dismissal from a university for "sexual assault" has life-long significant negative

consequences against a student and the procedure must be in good faith with such reality in mind.[6]

JWU failed to abide by its own above delineated procedure.  First, John Doe was not provided any precise guidance whatsoever as to how he could defend himself at the Hearing. JWU's own CRP did not and does not lay out how John Doe was to present his defense at the Hearing.  Indeed, none of the signed statements provide by JWU in its Motion (including that of Betsy Gray) actually assert that John Doe was told *how* the process works (i.e. nature of cross examination, ability to questions witnesses, process of questioning witnesses, ability to internally subpoena, process for admitting evidence, ability to record hearing or procure transcript for any appeal, ect.).

John Doe was a young shy student confronted with serious claims he denied and was (by JWU policy) alone, scared and in the dark.  As a matter of fact, he was actually placed in a nearly bare room with a telephone speaker on the table and an "advisor" next to him who, according to the CRP, could "not participate in any manner."  By no reasonable measure could this procedure have met, as the First Circuit decrees, "the students reasonable expectations" for a disciplinary process as contractually expected.

John Doe was *never* provided any written or oral guidance as to how he could bring evidence to the Hearing (i.e. Instagram postings, texts, ect.) or if he could even bring any at all. He was never provided any written or oral guidance as to how he could bring a witness in his defense and have such witness questioned by him.  Indeed, he was never told orally or in writing whether he could question the complainant's witnesses or the complainant herself.

---

[6] The Secretary of the U.S. Department of Education has announced that the procedures similar to those delineated in JWU's CRP violate a student's due process rights through Title IX.  The Department has promulgated new rules that universities who receive Federal funds (such as JWU) will have to implement.  This will, most assuredly, include the right to an attorney and the right to cross-examine witnesses, at the very least.

He was never told whether he could/should prepare an opening statement or closing remarks and, even if he could, how long he could speak for.  Shockingly, he was never even given a copy of the 18+ page incident report/ complaint brought against him (not even a *redacted* copy).  He was never even reasonably allowed to take notes while the 18+ page statement was read to him.  Quite frankly, this failure alone is inherently discriminatory to an accused who understands and learns better from reading.

JWU failed to keep any written or recorded record of the Hearing proceedings.  No record whatsoever!  JWU, in essence, expelled John Doe leaving him no reasonable ability to appeal internally. How can an accused appeal an expulsion arising from a Hearing when no record of what occurred at the Hearing exists? He can't. JWU's failure to provide a written copy of the Complaint and make a record of the Hearing is at best bad faith and at worst an intentional cover-up.

Very disturbingly, JWU never had John Doe's two roommates as witnesses at the Hearing and John Doe was never able to question them, yet their exculpatory statements are directly in the Complaint Report. If JWU was truly following the edicts and promises of the Code of Student Conduct, in essence actually looking for the truth, it would have summoned them in as witnesses; it did not.

JWU apparently ignored the fact that BK had previously stated back in June to JWU security that he first found out about the assaults in April or May of 2017.  Of course, John Doe had no way to examine this inconsistency because John Doe was not allowed to question BK as a witness; shockingly, BK was actually Mary Smith's "Advisor" during the expulsion Hearing. In addition, John Doe was never given copies of the JWU police reports and, therefore, had no knowledge of BK's deep involvement in the complaint.

If Joh Doe had such knowledge, he would have retained a strong line of questioning to attack Mary Smith's credibility in bringing the complaint. Recall that Mary Smith stated that one of the major ramifications of the alleged assault was that she was having trouble with her relationship with BK.  JWU denied this information to John Doe to his full detriment.

The above failures of internal procedural due process reasonably shock the conscience because even the most rudimentary contractual relationship between parties requires a fair playing field.  JWU in the case of John Doe did not follow this basic premise and the promise of good faith of the CRP.  Indeed the entire process, as the Rhode Island Supreme Court advised in City of Warwick v. Boeing Corp., 472 A.2d 1214, 1218 (R.I. 1984),"is unconscionable or tends to injustice or oppression". See also Doe v. Brown University, 210 F. Supp. 3d 310 at 330-331.

Additionally, the CRP specifically states that the three (3) Panelists who are judge, jury and executioner in John Doe's hearing process are "unbiased university officials who receive annual training on issues related to sexual harassment, sexual assault, sexual exploitation, dating violence, domestic violence and stalking, and how to conduct an investigation."

Intriguingly, JWU would not provide the names of the Panelists to John Doe before his hearing.  This failure by JWU alone denied John Doe the ability to investigate and determine whether the Panelists were prejudiced, biased or had an inherent conflict of interest.  Most importantly, JWU does not provide any information on what precisely the "annual training" the Panelists receive encompasses or includes.[7] As stated earlier in this Opposition, the training materials show inherent training bias in the focus of females as the victim and relying on trauma-induced training. It is a training regime which is inherently unbalanced against the male accused such as John Doe.

---

[7] The undersigned counsel requested this training material while handling John Doe's internal appeal and he was refused access to this information while the internal appeal was pending.

24

Also, as discussed earlier in this Opposition, Sgt. Robinson's investigation revealed an inherent presumption of guilt against the accused.  Indeed, as discussed above, he informed Mary Smith that he thought she was a victim and would be there for her.  He, clearly, never made an effort to be there for John Doe.

Importantly, the Dismissal Letter itself reveals unfairness and contractual bad faith in the decision making.  The Dismissal Letter states that, "The panelists noted that throughout the hearing, the respondent was not able to articulate specific ways in which he gained consent. Rather, he only noted that the complainant never stated that she was uncomfortable after the alleged incidents occurred. The complainant provided very specific information regarding the words and behaviors she used to convey that she did not give consent or withdrew consent." This reasoning for ruling against John Doe shows that he never had a chance.  JWU ruled against him because he could not articulate a negative while the complainant simply reiterated her story.  She says it happened and John Doe could not state how he gained consent.  How does an accused show evidence of consent when he says it never happened?  It cannot be done.  She never had to provide evidence that the events actually occurred.  The burden was all on him and that burden shift is in violation of the CRP.

### Count II - Claim for Breach of Covenant of Good Faith and Fair Dealing Should Proceed to a Trier of Fact

The First Circuit Court of Appeals and Rhode Island law are clear that if a viable claim for breach of contract exists, then a viable claim for breach of the covenant of good faith and fair dealing also exists.

The First Circuit stated that, "we agree that… the implied covenant of good faith and fair dealings imposed on every contract by Massachusetts law, applied in the context of school

disciplinary proceedings, creates an independent duty to provide basic fairness." <u>Doe v. Trustees of Boston College</u> at 87. The District Court in Rhode Island confirms that such ruling equally applies under Rhode Island law.  District Judge McConnell opined that, "Rhode Island law states that 'contracts contain an implied duty of good faith and fair dealing'" <u>Doe v. Brown University</u> at 30 (quoting <u>Havlik v. Johnson & Wales Univ.</u>, 490 F. Supp. 2d 250, 261 (D.R.I. 2007)). Judge McConnell further wrote that , "because John has a viable claim for breach of contract, he similarly has a viable claim that Brown violated the covenant of good faith and fair dealing inherent in that contract." <u>Id</u>.

John Doe's breach of the covenant of good faith and fair dealing claim must survive because his breach of contract claim, as discussed above, is surely ripe.

**Count VI - Claim for Negligent Infliction of Emotional Distress
Should Proceed to a Trier of Fact**

JWU owed John Doe a duty to act in a manner that reasonably would not cause Doe severe emotional distress through its negligent actions. John Doe, at the very lease has been, and is, in the zone of danger created by JWU's actions in regards to his disciplinary proceeding.

The claim for negligent infliction of emotional distress should not be dismissed.

**Count VII – Claim for Declaratory Judgment Should Proceed**

JWU has committed numerous violations of its contractual obligations and of federal and state law. As a consequence of these actions by JWU, John Doe's educational and career opportunities have been severely damaged. Without appropriate redress, the unfair outcome to JWU's deeply flawed process will continue to label John Doe as a predatory sexual offender, destroying his future career and life prospects, with no end in sight.

John Doe in his Complaint requests a declaration that (a) the findings and sanction against John Doe made by JWU be reversed; (b) John Doe's disciplinary record be expunged and removed from his education record at JWU; (c) JWU shall provide John Doe with a notarized letter confirming that the findings and sanction have been reversed and expunged from John Doe's records; (d) JWU shall make all reasonable efforts to restore John Doe's reputation;  and (e) JWU shall allow John Doe to continue and finish his education at JWU.

For the reasons stated above in this Opposition, John Doe's various other claims for Title IX violations, contract violations and tort should not be dismissed and should proceed to a trier of fact. With these claims still ripe, declaratory relief is more than reasonable and justified.  Such claims for declaratory judgment should not be dismissed.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court deny the Plaintiff's Motion for Summary Judgment, and for all other just and equitable relief.

Respectfully submitted,
JOHN DOE,
By his attorney,


/s/   James P. Ehrhard_____
James P. Ehrhard, Esq.
BBO # 651797
Ehrhard & Associates, P.C.
250 Commercial Street, suite 250
Worcester, MA 01608
(508) 791-8411
ehrhard@ehrhardlaw.com

Dated: August 9, 2019

**VERIFICATION**

I declare and affirm, under the pains and penalties of perjury, that to the best of my knowledge the allegations and statements set forth above are true and correct.

/s/   John Doe_____

August 9, 2019                                    JOHN DOE

**<u>CERTIFICATE OF SERVICE</u>**

I, James P. Ehrhard, hereby certify that I served the above Opposition to the following parties on today's date via U.S. Mail postage prepaid if not noted as having received copies via ECF:

Jeffrey S. Brenner, Esq., VIA ECF

Steven M. Richard, Esq., VIA ECF

/s/ James P. Ehrhard_____

James P. Ehrhard, Esq.

Dated: August 9, 2019